ANDREW NEWELL, trustee, & others *vs.* EUGENE J. HADLEY
& another, trustees, & others.

Suffolk.   November 30, 1909. — September 6, 1910.

Present: KNOWLTON, C. J., MORTON, LORING, SHELDON, & RUGG, JJ.

*Equity Jurisdiction*, To follow funds misappropriated by trustee.  *Trust.  Assignment,*
Of money.  *Bona Fide Purchaser.*

One, who was one of two trustees of one trust and also one of two trustees of a second
trust and was managing trustee of each, sold securities of the first trust for
$11,000 and deposited a check which he received in payment in a bank account
of the second.   Although, at the time of the deposit, he owed the second trust
over $9,000, he did not intend to pay his debt to the second trust with the check,
nor to borrow the money for the second trust from the first; but the deposit of
the check in the bank account of the second trust was made as the most con-
venient way of cashing it, and he at the time intended to use part of the proceeds
thereof for a personal speculation.   Before his co-trustee or any of the bene-
ficiaries in the second trust knew of his acts, he drew out the entire bank
account of the second trust and applied $3,864 thereof to personal uses.   There-
after he paid his debt to the second trust, rendered an account therein which
was allowed, and resigned as trustee, and his successor was appointed.   He
afterwards was removed as trustee of the first trust.   In a suit in equity by the
remaining trustee and the beneficiaries of the first trust against the trustees
and beneficiaries of the second trust to compel repayment of the entire $11,000, it
was *held*, that under the circumstances the $11,000, while it was on deposit in
the bank account of the second trust, belonged in equity to the first trust as
the property into which its $11,000 had been converted, and that the defend-
ants were not liable to repay the $3,864 appropriated therefrom by the fraudu-
lent trustee to his own uses before they knew anything about the matter.

If a stolen check is deposited by the thief in the bank account of a third person,
who does not know thereof, as a convenient way for the thief to collect the
amount of it, and thereafter, before the owner of the bank account knows of the
deposit, the thief draws out the entire sum so deposited, the owner of the bank
account is under no liability in equity to the person from whom the thief stole
the money.

One, who was one of two trustees of one trust and also one of two trustees of a second
trust and was managing trustee of each, with the purpose of misappropriating
funds, sold securities belonging to the first trust for $11,000 and deposited a check
which he received in payment in a bank account of the second trust as the most
convenient way of cashing it so that he could use the funds for his purposes.
At the time of such deposit, he owed the second trust over $9,000.   Thereafter
he drew from the bank account and applied to his own uses $3,864, and drew
and applied in payment of interest upon mortgages and of taxes, which were
overdue from the second trust with regard to land belonging to it, and of
simple unsecured debts of the second trust, $6,523.   The debts of the second
trust thus paid should have been paid by the trustee when they became due with
funds placed in his hands for the purpose, but he had misappropriated such funds.
Afterwards, in payments to the beneficiaries and to the co-trustee of the sec-

ond trust of amounts rightfully due to them, the bank account of the second trust was exhausted, and at that time the fraudulent trustee had stolen from the second trust the further sum of $8,042, which indebtedness he paid in some way not known, and then filed accounts which on their face were regular and disclosed none of his fraudulent transactions, and resigned as trustee of the second trust and his successor was appointed. The accounts were assented to by the co-trustee and beneficiaries, and were allowed, and no one knew of any of the fraudulent trustee's misdeeds for more than two years thereafter, when, they being discovered, he was removed as trustee of the first trust. Thereafter the remaining trustee and the beneficiaries of the first trust brought a bill in equity against the trustees and beneficiaries of the second trust to compel repayment of the $11,000. As to the $6,523 applied in payment of secured and unsecured debts of the second trust, it was *held,* that the $11,000 still belonged in equity to the first trust while it was on deposit in the bank account of the second trust; and *also,* KNOWLTON, C. J., dissenting, that, when the fraudulent trustee drew therefrom $6,523 and paid debts of the second trust, whether thereby he directly paid debts of the second trust or in legal contemplation was to be considered as having undertaken to pay his debts to the second trust with the money of the first and thereafter to have used that money in paying debts of the second trust, the money so used was the plaintiffs' and they were entitled in equity to recover from the defendants the amount so paid, and that such right of the plaintiffs was not affected either by the subsequent accounting of the fraudulent trustee with his co-trustee and the beneficiaries under the second trust or by the fact that the debts of the second trust, which the fraudulent trustee paid with the money of the first trust, should have been paid by him with funds of the second trust placed in his hands for that purpose. As to the sums paid to the co-trustee and beneficiaries of the second trust, it was *held,* that they became purchasers for value in good faith without notice of the fraud of the trustee, and that the plaintiffs could not recover such amounts.

An assignee of money receives no better title than the assignor had, unless the assignee is a purchaser for value in good faith without notice of any defect in the title of his assignor.

One, who had stolen $11,000, placed it in the bank account of a trust of which he was a trustee, in which bank account there already was $1,381. Thereafter he drew from the bank account $2,000 and fraudulently appropriated it for his own purposes, then drew $7,903, which he applied in payment of debts of the trust which then were overdue because of previous stealings on his part from the trust, and later drew the balance of the account and paid it out to beneficiaries of the trust and to a co-trustee for his commissions. In a suit in equity by the owner of the stolen money against one, who succeeded the fraudulent trustee, and the beneficiaries, to compel repayment of the amount of the plaintiff's money which was applied for the payment of trust debts, it was *held,* that, since it was the trustee's duty to use the $1,381, which was in the bank account of the trust before the $11,000 was deposited, for the purposes of the trust, he must be taken to have done so, and that no part of it was included in the $2,000 fraudulently appropriated by the trustee to his own use, although that amount was the first drawn; and therefore that the owner could recover from the defendant only $6,522.

BILL IN EQUITY, filed in the Supreme Judicial Court on November 1, 1907, by the trustee and beneficiaries of a trust under the will of Andrew H. Newell against the trustees and

beneficiaries of a trust under the will of James B. Pickett, seeking a repayment to the Newell trust from funds of the Pickett trust of sums alleged to have been wrongly diverted by Charles F. Berry, who formerly had been one of the trustees in both trusts.

The case was heard by *Hammond*, J., and was reserved for determination by the full court.

The facts are stated in the opinion.

*N. Matthews & R. Spring*, for the plaintiffs.

*G. L. Mayberry*, (*E. J. Hadley* with him,) for the defendants Hadley and Major, trustees under the will of James B. Pickett.

LORING, J. This is a bill in equity brought by the surviving trustee under the will of Andrew H. Newell and the beneficiaries of that trust against the trustees and beneficiaries under the will of James B. Pickett.

In November, 1901, one Charles F. Berry was the active trustee of each of these two trusts. His co-trustee in the Newell trust was Andrew Newell, whose residence was in Australia; and his co-trustee in the Pickett trust was Thomas E. Major, whose residence was in Ohio.

On November 15, 1901, Berry found himself in immediate need of $2,000 to be sent to the west in order to carry through a private speculation of his own. The Pickett trust was in need, but not in immediate need, of money for taxes and mortgage interest due in respect of a building or buildings owned and maintained by that trust. The need of money for taxes and mortgage interest on the part of the Pickett trust came from the fact that Berry had previously stolen money from that trust exceeding in amount the money needed for these purposes.

Under these circumstances Berry, on November 15, took to certain brokers a certificate for fifty-one shares of stock, the property of the Newell trust, and instructed them to sell the shares, and asked for an advance of $11,000 on account. He received from the brokers their check for $11,000, payable to "C. F. Berry, trustee." Berry and Major, trustees of the Pickett trust, had a deposit account with the Old Colony Trust Company, on which checks could be drawn by either trustee. Berry indorsed the check for $11,000 and deposited it to the credit of this account. There was at that time

the sum of $1,380.44 to the credit of that account. The deposit of the check for $11,000 seems to have been made after banking hours on the fifteenth, and for that reason was credited on the sixteenth, of November. On the afternoon of the fifteenth Berry drew a check for $2,000 on this account, took it to the trust company and obtained for it two drafts on New York, each for $1,000, which he sent to the west to carry through his personal speculation. Thereafter he drew twenty-one other checks on the account. The last check, for $63, was dated December 16, 1901, and resulted in the account being overdrawn to the amount, as stated in the reservation, of $8.88, but which appears to have been $18.88. Four of the twenty-two checks thus drawn, amounting in the aggregate to $3,864.85, were used by Berry for his personal expenses; eleven, amounting in the aggregate to $7,903.14, were used by Berry in paying on account of the Pickett trust taxes and mortgage interest due on the buildings of the Pickett trust, wages due to the scrubwomen and elevator boys of these buildings, and bills for lighting, steam heating and insurance on these buildings; six checks, amounting in the aggregate to $568.33, were used in payments to the beneficiaries of the Pickett trust of income due to them; and the last check, for $63, of which $18.88 was an overdraft, was used in paying to Mr. Major, Berry's co-trustee in the Pickett trust, the commissions due to him for services as trustee for that trust. That is to say, on the last check $44.12 was drawn out of the $11,000. Berry testified that he had no personal bank account at that time, and that he deposited the check for $11,000 with the Old Colony Trust Company to the credit of Mr. Major and himself, trustees of the Pickett trust, because that "was the handiest place," by which we understand him to have meant that depositing the check for $11,000 to the credit of the account of Major and himself as trustees of the Pickett trust was the most convenient way for him to cash it. He further testified that when he made this deposit "it did not enter my [his] head" to make the deposit as payment of his debt to that trust. At that time he knew that he was largely in debt to the Pickett trust, and on an examination made during the hearing before the single justice he found that the sum then due from him to the Pickett

trust amounted to $11,185.50 gross, or, deducting a sum equal to the usual commissions, to $9,515.50. But he testified that at the time (to wit, on November 15, 1901) he did not know the exact amount of that debt. In March, 1902, Berry was again in debt to the Pickett trust to the amount of $8,042.33. From some source or sources not mentioned in the reservation he paid up this amount on March 26 and rendered an account on March 27, 1902, which was allowed. Berry resigned his position of trustee of the Pickett trust in March, 1903, and was succeeded by the defendant Hadley.*

The plaintiffs' first contention is that the defendants are liable for the whole $11,000. In our opinion that is not so. Berry did not in fact intend to make the $11,000 the property of the Pickett trust by borrowing that money in behalf of that trust or by paying with it his debt to the Pickett trust. All that he intended to do was to put the $11,000 in the name of himself and his co-trustee in the Pickett trust as the " handiest " way of cashing the $11,000 check. The $11,000 while it was on deposit in the Old Colony Trust Company belonged in equity to the Newell trust as the property into which its $11,000 had been converted. The whole $11,000 had been all drawn out by Berry before the defendants or any of them knew anything about it. A defendant is not liable to repay to the owner the amount of a stolen check fraudulently put to his (the defendant's) credit to enable the thief to collect the amount of it when the proceeds have been drawn out by the thief before the defendant knows anything about the matter.

It follows that the defendants are not liable for the $3,864.85 applied by Berry for his own use.

The plaintiffs' second contention is that so far as the $11,000 was applied in discharge of debts owed by the Pickett trust the Newell trust has a right of recovery.

The amount drawn out of this bank account to pay debts owed by the Pickett trust is (as we have said) $7,903.14. But there was the sum of $1,380.44 to the credit of the Pickett trust in this bank account when the $11,000 was deposited. There

---

* Berry was removed as trustee of the Newell trust by order of the Probate Court on April 8, 1905.

is a question therefore whether the amount of the plaintiffs' $11,000 used in paying the defendants' debts is $7,903.14 or $7,903.14 less $1,380.44, that is to say $6,522.70. As matter of convenience we will now assume that it is the smaller amount (namely, $6,522.70) and we will deal with that matter later on.

On the footing that the amount paid out for debts is $6,522.70, the amount paid out for mortgage interest and taxes was $6,045.19 and for unsecured debts due from the Pickett trust $477.51.

It was decided in *Foote* v. *Cotting*, 195 Mass. 55, that under the circumstances of the case at bar the Newell trust has no remedy at law even for the money belonging to it used in paying taxes on the land of the Pickett trust. But it was suggested in that case, at page 63, that to the extent to which one trust has been benefited through the payment out of its money of the taxes on the land of the other (under circumstances such as those in the case at bar) there might be a remedy in equity on the principle of subrogation, citing *Webber Lumber Co.* v. *Shaw*, 189 Mass. 366. For a recent case which lends support to that suggestion, see the first case reported under the title of *Title Guarantee & Trust Co.* v. *Haven*, 196 N. Y. 487. It would seem that on this principle the plaintiffs would be entitled to a decree (1) for a charge upon the defendants' land to the amount of the tax paid with their (the plaintiffs') money and (2) for a charge, except as against the mortgagee, upon their (the defendants') land to the amount of the mortgage interest paid with their (the plaintiffs') money. But it is not necessary to pursue this further because we are of opinion that the plaintiffs are entitled to a personal decree against the defendants for simple debts paid with their (the plaintiffs') money, and that they are entitled on the same ground to a personal decree for payments of taxes and mortgage interest made with their money.

It has long been the settled law of England that where the money of A has been used in extinguishing the legal liabilities of B (although no debt or other obligation is created thereby at law), equity will let A enforce against B the obligations of B's creditors paid off by his (A's) money. The principle was applied in *Harris* v. *Lee*, 1 P. Wms. 482, where a wife borrowed money to pay for necessaries and afterwards the husband died having devised land in trust for the payment of his debts.

Although a husband is liable for his wife's debts incurred for
necessaries, he is not liable for money borrowed by his wife to
be used in paying for necessaries.　That was admitted in *Harris*
v. *Lee*, *ubi supra*, and *Knox* v. *Bushell*, 3 C. B. (N. S.) 334, is a
decision to that effect.　Not only was that decided in *Knox* v.
*Bushell*, but it was also decided there that in such a case there is
no remedy on the common counts or in any other way at law.
It was held in *Harris* v. *Lee* that the plaintiff (whose loan to
the wife was void) had a right to be paid the sums which were
due to the creditor who had furnished necessaries to the wife
and who had been paid out of the money furnished the wife
under the void loan.　The principle was applied also in case of
money borrowed by an infant, which was used to buy neces-
saries.　*Marlow* v. *Pitfeild*, 1 P. Wms. 558.　It was pointed out
in *Marlow* v. *Pitfeild* that there is no liability at law in such a
case; and *Darby* v. *Boucher*, 1 Salk. 279, is a decision to that
effect.　The most common application of this principle has been
where money borrowed by a corporation which had no power to
borrow money has been used in paying its debts.　*In re Cork &*
*Youghal Railway*, L. R. 4 Ch. 748.　*Blackburn Building Society*
v. *Cunliffe, Brooks & Co.* 22 Ch. D. 61.　*In re Wrexham, Mold &*
*Connah's Quay Railway*, [1899] 1 Ch. 205; *S. C.* on appeal,
*Ibid.* 440.　Lastly, this principle was applied in 1906 in a case
where the London agent of ship and insurance brokers carrying
on business in Liverpool (who had withdrawn money for his
own account without right) without authority borrowed money
in behalf of his principals and applied it in payment of the
expenses of the principal's London business.　*Bannatyne* v.
*MacIver*, [1906] 1 K. B. 103.

The case at bar is a stronger case for the application of this
principle than any of these mentioned above in which it has
been applied.　The plaintiffs' money in the case at bar was
stolen from them without fault on their part, not lent by them
under an invalid contract.　Since Berry had the legal right to
the custody of the property in which the plaintiffs had the bene-
ficial interest, the plaintiffs were not at fault in letting it remain
in his possession.　On the other hand it might well have been
held that the persons who lent the money in the English cases
*ubi supra* were chargeable with knowledge of the invalidity of

the loans.   See in that connection *Bannatyne* v. *MacIver*, [1906] 1 K. B. 103, 109.

There are suggestions in some of these cases that the doctrine on which they rest is that in such cases the lender is subrogated to the rights of the creditors.    In others it is suggested that in these cases the true owner of the money is allowed to trace his property into the benefit enuring to the defendant, on the principle on which an owner can in equity trace his property into any form into which it has been wrongfully converted. And in others, that this is an independent ground of equitable relief.   It is not necessary to determine whether these principles are not in their essence the same or what is the most accurate way of stating the principle on which these cases rest, for we are of opinion that they were well decided, and that the principle on which they rest is well founded and should be adopted by us.

The question, therefore, on which the case at bar depends is whether the money, with which the debts due from the defendants stated above were paid, was the plaintiffs' money.

But before we take up that question we will consider some cases relied on as cases which stand in the way of giving to the plaintiffs any relief in the case at bar.

It is settled that an intermeddler by gratuitously paying the debt of another does not create a legal obligation between himself and that other.    That was decided in *Winsor* v. *Savage*, 9 Met. 346; *South Scituate* v. *Hanover*, 9 Gray, 420; *Provincetown* v. *Truro*, 135 Mass. 263; *Massachusetts Mutual Life Ins. Co.* v. *Green*, 185 Mass. 306.   For decisions based on the same principle see *Boston Ice Co.* v. *Potter*, 123 Mass. 28; *Brown* v. *Fales*, 139 Mass. 21; *Harrison* v. *Moran*, 163 Mass. 495.

It is also settled that the result is the same if the money used in paying the debts was lent to one who had authority to pay the debt, but who had no authority to borrow the money. *Kelley* v. *Lindsey*, 7 Gray, 287.     *Railroad National Bank* v. *Lowell*, 109 Mass. 214.     *Agawam National Bank* v. *South Hadley*, 128 Mass. 503.

All these decisions were put in the several opinions on grounds applicable to actions at law, namely: (1) that an action for money paid does not lie unless the money was paid at the

defendant's request, and (2) that the conferring of a benefit on another, if it be done voluntarily, that is to say, if it be done without any request by that other, does not create any legal obligation and therefore an action for money had and received does not lie. The fact (that no liability at law is brought into existence by the use of A's money in paying B's debts without B's knowledge or request) does not stand in the way of equity allowing A to stand in the shoes of B's creditors paid off by his (A's) money. It is pointed out in nearly every one of the English cases, *supra,* that there is no remedy at law, and it was suggested (as we have said) in *Foote* v. *Cotting,* 195 Mass. 55, 63, that although there was no remedy at law (as was decided by this court in that case) relief might be given in equity. The distinction between *Kelley* v. *Lindsey,* 7 Gray, 287, and *Bannatyne* v. *MacIver,* [1906] 1 K. B. 103 (in which opposite conclusions were reached), is that one was an action at law and the other a suit in equity.

It should be noted in passing that a gratuitous payment by a plaintiff who is an intermeddler does not entitle him to any relief in equity by way of subrogation. Sheldon on Subrogation, § 1. This is settled and was stated in *Title Guarantee & Trust Co.* v. *Haven,* 196 N. Y. 487, 495, 496, to be law.

The decision in *Craft* v. *South Boston Railroad,* 150 Mass. 207, however, was put on broader grounds than those taken in *Winsor* v. *Savage* and the other cases *supra.* In that case a defaulter without authority borrowed the plaintiff's money and used it in paying the debts of the defendant (his principal) whose money he had stolen. The decision that the plaintiff was not entitled to relief was not put on the ground that the plaintiff had sought relief in an action at law. On the contrary Field, J., said : " Whether a person under any circumstances can be made a debtor for money borrowed by another for him, without authority, and appropriated to his use without his knowledge or consent, need not be considered. See *Kelley* v. *Lindsey,* 7 Gray, 287. No obligation on the part of the defendant ought to be implied in this case, because Reed was a defaulter, and the money was used to cover up his defalcation by paying debts of the company, which the money of the company, if he had not embezzled it, would have been used to pay. The only reasonable

inference is that Reed's primary purpose in using the money in this way was to escape detection and to benefit himself. Whether it was a benefit to the company that he was able to obtain and use money for this purpose is necessarily uncertain. The money was not borrowed *bona fide* for the use of the company. See *Railroad National Bank* v. *Lowell*, 109 Mass. 214; *Agawam National Bank* v. *South Hadley*, 128 Mass. 503."

It appears from the original papers in that case that the money there in question was borrowed by the defaulter in January, 1885, and used at that time in covering up his defalcations by paying some of the defendant's debts. It was not until November, 1886, (a year and nine months later,) that his defalcations were discovered. Reed, the defaulter, testified that "for some time before giving the note, and at that time, and so continuing until November, 1886, he had taken large sums of the defendant's money and appropriated them to his own personal use, all of which he had concealed from the defendant's officers until November, 1886, when his embezzlements were discovered." In other words, the use of the plaintiff's money in paying the defendant's debts in that case had resulted in enabling the defaulter to steal more money from the defendant, and what this court meant when it said, " Whether it was a benefit to the company that he was able to obtain and use money for this purpose is necessarily uncertain," was that this plaintiff had failed to prove that the transaction as a whole had resulted in a benefit to the defendant when the payment of the defendant's debts with the plaintiff's money had enabled the defaulter to steal more money than was so paid.

It is not necessary to consider in the case at bar whether this court was right in deciding in *Craft* v. *South Boston Railroad* that the rights of the parties depended upon the ultimate result of Reed's transactions taken as a whole, and not upon the direct and immediate result of the individual payment of one of the defendant's debts with the money of the plaintiff. What was decided there was that where no benefit enures to the defendant from all of the defaulter's transactions taken as a whole no benefit can be said to enure to a defendant because one of its debts was paid in the course of a series of thefts which the defaulter was enabled to continue by the payment in question. In the .

case at bar the payment of the defendants' debts with the plaintiffs' money, whether Berry's transactions be taken as a whole or separately, did enure in a benefit to the defendant.   In the case at bar, as in *Craft* v. *South Boston Railroad*, there was a further defalcation.   But in the case at bar the further defalcation did not result in any loss on the part of the defendant as it did in *Craft* v. *South Boston Railroad*.   The $8,042.33 subsequently stolen by Berry was paid up by him on March 27, 1902. There is no suggestion that there was any subsequent defalcation on Berry's part.

There were two cases before the court in *Title Guarantee & Trust Co.* v. *Haven*, 196 N. Y. 487.   In one case relief was given by way of subrogation; in the other it was denied.   In the case in which it was denied it was denied because the tax paid was levied in the lifetime of the testatrix and constituted a debt due from her estate and not from the defendant who was devisee of the land.   What was decided was that in such a case the benefit enuring from the payment of that tax enures to the benefit of the estate of the testatrix and not to the benefit of the devisee of the land.   In the case in which subrogation was allowed the assessment did not create a personal obligation on the part of anybody.   It was a lien on the defendant's land and nothing more.   For that reason the benefit from the payment of the assessment enured to the benefit of the devisee of the land.

We find nothing in these cases which prevents us from acting on the principles applied in *In re Cork & Youghal Railway*, L. R. 4 Ch. 748, and the other English cases, *supra*, and we are finally brought to the question stated above, namely: Was the money used in paying these debts of the defendants the money of the plaintiffs?

We have already held that the $11,000 did not become the money of the defendants when it was deposited by Berry to the credit of the defendants' trustees in the Old Colony Trust Company, without their knowledge, to enable him to complete his theft.

But when Berry drew out $6,522.70 of the $11,000 belonging to the Newell trust on deposit in the Old Colony Trust Company and applied it in payment of debts due from the Pickett trust, either he directly paid the defendants' debts with the plaintiffs'

money or he in legal contemplation undertook to pay his debt to the Pickett trust with the plaintiffs' money, and used the money so paid to that trust in paying its debts.

If he is to be considered to have paid the defendants' debts directly with the plaintiffs' money, the case at bar comes within the principle of the English cases referred to above.

And the result is the same if in legal contemplation Berry is to be considered to have undertaken to pay his debt to the defendants with the plaintiffs' money and then to have used that money in paying the defendants' debts. This attempted repayment by Berry of his debt to the Pickett trust did not make the money so paid to them their money. It was the plaintiffs' money in the beginning, it remained the plaintiffs' money while it was on deposit in the Old Colony Trust Company, and it did not cease to be the plaintiffs' money when Berry used it in paying his debt to the trust of which he was one of two trustees, because he and he alone acted for the Pickett trust in receiving the attempted payment.

The general rule is that an assignee of money gets no better title than the assignor of it had. But the assignee does get a better title than his assignor had if he is a purchaser for value in good faith and without notice.

Apart from authority it would be a strange doctrine if it were law that the true owner of money lost his title to it by a thief who stole it undertaking to use it in paying a debt owed by the thief to another, when the thief and no one else received for that other the payment so made. It is not conceivable that such a manipulation by a thief of stolen money should result in the true owner's losing his title and the creditor of the thief getting a better title to the money than the thief had to it.

But that proposition does not rest on principle alone. It was on this ground that this court rested its decision in *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268. It was decided in that case that if a payment is made with stolen money and the person to whom the payment is made is represented in receiving the payment by the thief who is paying his debt with the stolen money, the person to whom the payment is made is chargeable with the thief's knowledge and gets no better title than the thief had to give. The auditor in *Atlantic*

*Cotton Mills* v. *Indian Orchard Mills* found that the money transferred in that case was not a payment but a transfer to cover up the defalcation. And this court might well have rested its decision on that ground. But to quote the words used by it: " We have preferred to put the decision of this point upon the broad ground, that, if the treasurer of a corporation is a defaulter, and his defalcation is as yet unknown and unsuspected, and he steals money from a third person and places it with the funds of the corporation in order to conceal and make good his defalcation, and the corporation uses the money as its own, no other officer knowing any of the facts, the corporation does not thereby acquire a good title to the money, as against the true owner, but the latter may maintain an action against the corporation to recover back the same." See page 276. It was pointed out in *Atlantic Cotton Mills* v. *Indian Orchard Mills,* just cited, that the majority and the minority of this court in the earlier case of *Atlantic Bank* v. *Merchants' Bank,* 10 Gray, 532, were agreed on this point.

This proposition (decided in *Atlantic Cotton Mills* v. *Indian Orchard Mills*) has been recognized since then as undoubted law. *Corcoran* v. *Snow Cattle Co.* 151 Mass. 74, 75. *First National Bank of Grafton* v. *Babbidge,* 160 Mass. 563, 565. *Jaquith* v. *Davenport,* 191 Mass. 415, 417, 418. *Foote* v. *Cotting,* 195 Mass. 55, 61, 62. And there is no case to the contrary in any jurisdiction.

It was expressly pointed out in *Atlantic Cotton Mills* v. *Indian Orchard Mills,* 147 Mass. 268, 277, that where the person receiving the stolen money is represented by an innocent person (a class of cases of which *Innerarity* v. *Merchants' National Bank,* 139 Mass. 332, is an example and is the leading case in this Commonwealth) a different case is presented from that which is presented where the thief and the thief alone act for his creditor in receiving stolen money.

There can be no question either on principle or on authority of the correctness reached in *Innerarity* v. *Merchants' National Bank* and the other cases belonging to that class. But they are quite apart from the case decided in *Atlantic Cotton Mills* v. *Indian Orchard Mills* and from the case which we have to decide here, where no one but the thief acts for the principal to whom

payment of the stolen money is made. There is no case in which it has been held that under those circumstances the original owner of the money has lost his title and the person in whose behalf the thief receives the payment gets a better title than the thief had. Further there is no case in which the distinction pointed out in *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268, 277, has been questioned.

Adopting the words of this court in *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268, 274: It is not as if Berry, after stealing $11,185.50, or $9,515.50, from the defendant trust (as he did) had called the innocent trustee or the beneficiaries of that trust " together and informed them of his indebtedness and of his desire to make a payment on account, and had then paid over to them the money [this $6,522.70] as money coming from himself, and they had received it without knowledge or suspicion that it had been stolen, and given him credit for it as part payment." In that case the Pickett trust would have been a purchaser without notice within the doctrine invoked by the defendant in the case at bar.

That is not what took place. When Berry repaid in part the money stolen from the defendants by paying their debts with the $6,522.70 stolen from the plaintiffs, Berry and Berry alone represented the defendants in receiving the $6,522.70. They " must be deemed to have known what he knew; and " they " cannot retain the benefit of his act, without accepting the consequences of his knowledge." The defendants " cannot obtain greater rights from his act than if . . . [they] . . . did the thing itself, knowing what he knew," to quote again from *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268, 274.

But it is said that when this money was used in paying the defendants' debts there was a transaction in which Berry was not the only person on both sides. It is said that the creditors who were paid were on the other side of the transaction. The creditors who were paid were on the other side of a transaction. But the transaction in which the creditors were on the other side consisted in the payment of the debts owed by the defendants to them. In that transaction the creditors got a good title to the money paid to them by Berry. But they took no part in the transaction by which Berry paid his debt to the

defendants with money stolen from the plaintiffs. Berry and Berry alone was on both sides of that transaction.

In this connection it should be pointed out that there were payments made out of this $11,000 to the beneficiaries of the defendant trust and to Berry's co-trustee. In receiving these payments the beneficiaries and the co-trustee did not act through Berry. They acted for themselves. They are *bona fide* purchasers without notice of the money so paid to them, and the plaintiffs have no claim for the $612.45 ($568.33 + $44.12) so paid out.

But the defendants say that there was an accounting later on, and that they became purchasers for value without notice by virtue of that accounting within the doctrine recognized by this court in *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268, 279 : " There is another class of cases where the same person has been trustee of two different funds, and has fraudulently transferred securities from one trust fund to the other. But in each case of this class which has been cited, there has been something in the nature of an accounting, and the trust fund which has received and has been entitled to retain the benefit has been partly or wholly represented either by the *cestuis que trust*, or by an innocent trustee representing them. *Thorndike* v. *Hunt*, 3 De G. & J. 563. *Taylor* v. *Blakelock*, 32 Ch. D. 560. *Case* v. *James*, 29 Beav. 512; *S. C.* on appeal, 3 De G., F. & J. 256."

But that is not so in the case at bar. The last of the $11,000 was drawn out by Berry on December 16, 1901. It was drawn out by the check for $63 which paid the innocent trustee the commissions due to him, and that check (as we have said) was an overdraft to the amount of $18.88. The accounting here relied on by the defendants was three months later, in March, 1902.

The accounting in the case at bar was had not only after the repayment had become complete without anybody (but the thief) knowing of the repayment, but the accounting was had three months after the last penny of the money repaid had been expended without anybody but the thief knowing of the repayment and of the expenditure of the money repaid. There was no fund then in existence of which the defendants could become purchasers for value without notice. How that accounting could

be held to make the defendants purchasers without notice of money which had been paid out three months before has not been explained.

Apart from its effect upon the defendants being purchasers for value, the accounting which was had did not affect the rights of the parties. When the accounting was had in the case at bar the fact of the repayment was not stated or known to any one but Berry the thief. What happened was that four months after the repayment was made and three months after the money repaid had been expended, Berry filed an account in which he stated that he had received and properly paid out the income of the trust fund, and that account was assented to by the defendants on the footing that it was a true account. In a case where a thief steals money without his principal's knowledge, repays it with money stolen from some one else without his principal's knowledge, and pays out the other stolen money (so repaid by him) without his principal's knowledge, the rights of the parties are not changed by the fact that after the money so repaid has been paid out, the thief makes up a lying account in which no one of these facts is disclosed and the principal assents to it on the footing that it is a true account. Such an account is a fraud on the principal and can be set aside by him at any time.

It happens that it has been decided that the rights of the parties in a case like that now before us are fixed when the payment is made, and that they are not affected by a subsequent accounting similar in its legal aspects to the accounting which took place in the case at bar. It was so decided in *Atlantic Bank* v. *Merchants' Bank*, 10 Gray, 532. It could not be held that the subsequent accounting in the case at bar made the defendants *bona fide* purchasers for value without overruling the decision there made. The facts in that case were these: The paying teller of the defendant bank was a defaulter to the amount of $25,000. He was told at a quarter before two o'clock that his cash would be counted that afternoon. By a fraudulent conspiracy he procured possession of bank bills belonging to the plaintiff bank by two o'clock and put them in his drawer. Between three and six o'clock on the same afternoon, these bills were taken from his drawer and counted as the property of the

defendant bank by a committee of the directors appointed to examine into the condition of the bank. It was held by a majority of the court that the repayment was complete when the bills were put in his drawer by the paying teller at two o'clock; that the bank was chargeable with the knowledge of the defaulting teller because he acted for the bank in receiving the repayment; and that the defendant's title was not affected by the subsequent counting of the bills as the defendant's property later during the same afternoon. The minority took the view that the repayment was not complete until the bills were counted by the committee of the directors, and that the defendants, by that counting, became purchasers without notice.

We are of opinion therefore that whatever view be taken of the transaction the $6,522.70 used by Berry in paying the defendants' debts was the plaintiffs' money.

The only other ground on which the defendants could be thought to have a better equity than the plaintiffs arises from the fact that the defendant trust had provided Berry with money to pay the debts paid by him with the money of the plaintiffs.

The fact that the defendants had put Berry in funds to pay the debts paid with the plaintiffs' money (in our opinion) does not bar them from the equity to which that gives rise. The first act done by Berry was to steal from the defendants $11,185.50, or $9,515.50, whichever is the true sum (as we have stated above). That made Berry the defendants' debtor for that sum. Then Berry repays to the defendants (Berry and Berry alone accepting the payment in behalf of the defendants) $6,522.70 on account of this debt of $11,185.50, or $9,515.50 owed by him to the defendants. The $6,522.70 so repaid did not become the defendants' money because Berry acted for the defendants in receiving it. Then Berry uses this money so repaid to the defendants in paying the defendants' debts. The money used in paying the defendants' debts was the plaintiffs' money. Berry still owes the defendants the $11,185.50, or $9,519.50. That debt was not in part paid by Berry's manipulation of the $6,522.70. It cannot be that in equity the defendants are to have both their claim against Berry for the $11,185.50, or $9,515.50, and the payment of their debts to the amount of $6,522.70. Since Berry's manipu-

lation of the $6,522.70 did not pay his debt to the defendants (and we have seen that it did not), the fact that the occasion for Berry's stealing $6,522.70 from the plaintiffs and using it in paying the defendants' debts was because he had stolen the funds provided by the defendants to pay these debts, does not affect the plaintiffs' equity growing out of the fact that it was their (the plaintiffs') money which in fact paid the defendants' debts, and that a benefit enures to the defendants from that fact.

As matter of authority the only case on the point that has come to our attention, (*Bannatyne* v. *MacIver*, [1906] 1. K. B. 103,) is in accord with this view of the law. The suit in *Bannatyne* v. *MacIver* was on a bill for £350, the amount of unauthorized borrowing of money made by the defendant's London agent (Hudson by name) at four different times. When the first money was borrowed the London business was short of funds without fault on Hudson's part. But subsequently to the first loan and before the other three had been made, the principals had "sent him [Hudson] considerable sums of money, more than sufficient to cover the liabilities of the branch, and rendering any borrowing by Hudson unnecessary," page 104. The necessity for the money borrowed on the last three occasions came from the fact that Hudson had withdrawn sums which he had no right to withdraw. How much of the £350 constituting the four borrowings was attributable to the first, when Hudson had not wrongfully withdrawn money, and how much of it was attributable to the three other borrowings caused by Hudson's wrongful withdrawals does not appear. It was held that the plaintiff's equity to stand in the shoes of the creditors paid off with their money did not depend upon the state of the account between the defendants and Hudson. Romer, L. J., dealt directly with this part of the case in these words: "It [the state of account between the agent and the principals] might be relevant if the plaintiff were seeking to enforce a different equity, that is, the right to stand in the shoes of the agent as against his principal."

It follows that the defendants have no superior equity with respect to the $6,522.70 used in paying the debts of the defendants, and that the plaintiffs to that extent are entitled to be repaid by the defendants.

This brings us to the question which we referred to in the beginning of this opinion and which we then left undecided, to wit, How much of the $7,903.14, paid in discharge of debts due from the Pickett trust was paid out of the $11,000 stolen from the plaintiffs ?  The plaintiffs claim that the rule in *Clayton's case*, 1 Mer. 572, applies; and applying that rule, that the $2,000 drawn by Berry on November 15 for his own use must be applied to the balance on deposit when the $11,000 was deposited, so far as the amount of that balance ($1,380.44) goes, and that $619.56 only of that $2,000 was paid out of the $11,000.  In other words, that when Berry took $2,000 out of this account for his own use in the afternoon of November 15, he stole $1,380.44 from the Pickett estate and $619.56 only from the Newell trust. The defendants contend, however, that Berry stole this $2,000 from the Newell trust and that the $1,380.44 on deposit in the Pickett account must be taken to have been applied to the payment of the Pickett trust debts.  If the contention of the defendants is right, the sum expended out of the $11,000 in payment of the Pickett trust's debts amounts to $6,522.70, as we have said.

We are of opinion that the contention of the defendants is correct, and that the rule in *Clayton's case* does not apply.   The rule in *Clayton's case* is that as between two *cestuis que trust* the order of drawings on a bankrupt's bank account is the order of application.   But when the fund drawn on is a mixed fund belonging to the defendant and his beneficiary, the order in which the drawings are made is not material, and money which could have been properly drawn out by the bankrupt will be appropriated accordingly.  *Hewitt* v. *Hayes*, 205 Mass. 356.  *In re Hallett's estate*, 13 Ch. D. 696.  *In re Oatway*, [1903] 2 Ch. 356.   The bank account here in question was not Berry's bank account but the bank account of the Pickett trust, and the $11,000 put into that account was put in there primarily to enable Berry to get a draft for the sum of $2,000 on his own account, and secondarily to pay taxes and mortgage interest amounting to $7,903.14, due from the Pickett trust and then overdue because of prior stealings by him from the Pickett trust.   It was Berry's duty to use the $1,380.44, so far as it went, in paying this $7,903.14 due from the Pickett trust for

taxes and mortgage interest ; and under the rule in *Hallett's case* he must be taken to have done so without regard to the order in which the checks were drawn.

We are therefore of opinion that the plaintiffs are entitled to recover the several sums making up the amount of $6,522.70, with interest at six per cent from the several dates on which they were respectively used in paying debts due from the defendants.

*Decree accordingly.*

KNOWLTON, C. J. Because the decision in this case seems to me wrong and likely to be misleading I think it my duty to give the reasons for my dissent. With much of the discussion in the opinion I agree, but some of the cases referred to seem to me to be wrongly interpreted.

It is shown conclusively in the opinion that no debt was created against these defendants. Neither an action for money had and received nor an action of any other kind could be maintained against them. The principle upon which the plaintiff seeks to recover is that an owner of property which has been stolen or misappropriated, if he has no adequate remedy at law, may follow it wherever he can find it and identify it, and have it restored to him by a court of equity. In some of the early cases it was decided that this could not be done if the property was money. But the law is now held more liberally, so that a plaintiff may prevail if the fund can be traced and identified, even though the particular pieces of money are mingled with others and cannot be recognized. This rule is subject to the exception that, if the money is used in the payment of a debt to one who receives it in good faith, in satisfaction of the debt, it cannot be recovered in equity any more than at law. In my opinion, this principle is applicable to the present case.

Berry, as a trustee, stole the plaintiffs' money. As a trustee he had stolen a similar sum from the defendants previously. He was engaged in a general course of embezzlement from the defendants. He used the plaintiffs' money in this course of embezzlement, to pay debts of the defendants which he should have paid previously with other money belonging to them, intending by these payments to prevent detection in his criminal course.

Subsequently he stole other money of the defendants to a like amount, and afterwards on their demand rendered an account as trustee and paid back the balance due them. Neither the defendants nor any one representing them had any knowledge of his embezzlements, but they acted in good faith in the settlement with him. Can they be charged with the stolen money that he used in the payment of their debts, for the payment of which he was primarily liable as trustee, he having also received money from them which should have been used in paying the debts?

It is too plain for argument that there could be no recovery by the plaintiffs from the original creditors to whom the payments were made. They received the money in good faith and discharged their claims, and in reference to their rights the money is equitably as well as legally theirs. The obligation of Berry to make these payments and the right of the defendants to have him make them were as great in reference to the defendants' rights as they were in reference to the rights of the original creditors. At that time, as between Berry and the defendants, these were his debts and not the defendants' debts. The equitable as well as the legal right of the defendants to have and retain the benefit of his payments was as perfect as the similar right of the original creditors. The only ground upon which this can be questioned is that Berry was one of the trustees, and as such, for some purposes, an agent of the defendants, who might be thought to be chargeable with his knowledge and conduct when he made the payments. This ground would be substantial, if at the time of making the payments he had been acting fairly as their trustee, without any wrongful purpose to obtain an advantage to himself to their detriment. But he was in the midst of a course of embezzlement from these defendants, begun before and continued after the making of the payments, and the payments were made in his own interest, to prevent the discovery of his crimes. In such a case the knowledge of the agent is not imputable to the principal against whom he is acting criminally for his own benefit. This principle is well established in Massachusetts. *Indian Head National Bank* v. *Clark*, 166 Mass. 27, 30. *Allen* v. *South Boston Railroad*, 150 Mass. 200, 206. *Foote* v. *Cotting*, 195 Mass. 55, 61, 62. *Innerarity* v. *Merchants National Bank*, 139 Mass. 332. *Produce Exchange Trust*

*Co.* v. *Bieberbach,* 176 Mass. 577, 588. *Shepard & Morse Lumber Co.* v. *Eldridge,* 171 Mass. 516, 531. In 31 Cyc. 1595, the doctrine is stated as follows : " The rule that notice to an agent is notice to the principal being based upon a presumption that the agent will transmit his knowledge to his principal, the rule fails when the circumstances are such as raise a clear presumption that the agent will not perform this duty ; and accordingly, where the agent is engaged in a transaction in which he is interested adversely to his principal or is engaged in a scheme to defraud the latter, the principal will not be charged with the knowledge of the agent acquired therein." A note contains copious citations in support of this doctrine, from the highest courts in Alabama, Connecticut, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Dakota, Ohio, Pennsylvania, South Carolina, Texas, Utah, the United States, England and Canada. The rule is stated in similar language in 1 Am. & Eng. Encyc. of Law, (2d ed.) 1145, and is supported by numerous citations.

I think that the law is overwhelmingly established, not only in Massachusetts, but all over the English-speaking world, to the effect that the defendants are not chargeable with Berry's knowledge which was acquired or used in connection with the crimes that he was committing against them. If they are not so chargeable, whether we treat the case as an attempt to follow the fund and have it restored to the plaintiffs, or as an attempt to be subrogated to the former rights of the original creditors and thus to get the benefit of the fund, I think there is no ground for a claim against these defendants.

If the plaintiffs seek to follow the fund and have it returned by those in possession of it, the defendants answer that the money paid to their creditors never came into their possession. It did not go beyond the possession of the creditors, who received it in payment of their debts from the person who ought to pay them. The plaintiffs may then say that because these creditors applied the money to the discharge of these debts, which were also secondarily the defendants' debts, it came constructively into the hands of the defendants, since they have had the benefit of it. If for this reason it is to be treated

as constructively in the hands of the defendants, it came into
their hands through the original creditors who represented them
in the receipt of it and who received it in payment of debts,
under such circumstances that it cannot be taken away from
them; and the constructive receipt of it by the defendants
through them, is for this reason charged with this same right to
have it remain where it is. The defendants were as ignorant as
the original creditors of any fact that could affect the validity of
the payments.

If the plaintiffs seek to recover under the principle of subroga-
tion, they encounter at the outset the doubtful question whether
that principle can be applied to payments of stolen money, made
by a thief. Assuming in their favor that it can, their right or
subrogation is to the rights of the creditors against the party
who was primarily bound to make payments, namely, Berry.
The plaintiffs can ask to be permitted to proceed against Berry
for the collection of these debts. Berry would be estopped from
setting up that the debts had been paid; for the payments were
made with money that he stole from the plaintiffs, and as
against them he could not avail himself of the payments. But
if the plaintiffs seek to go beyond Berry to the defendants, they
cannot claim an estoppel against them. Unless the defendants
are chargeable with Berry's knowledge, the payments made to
the original creditors are completely effectual for the protection
of the defendants from an attempt to revive these debts that
were legally discharged. The payments were made in money,
to persons who received and applied it in the satisfaction of
debts which Berry primarily, and the defendants secondarily,
were bound to pay.

There is not only this defense growing directly out of the
transactions with the original creditors, but the defendants
afterwards, in the final settlement of their account with Berry,
acting innocently and in utter ignorance of any fact that could
affect their rights adversely, treated all these payments to the
original creditors as payments by Berry to themselves and
allowed a full consideration for them. In this respect their
rights are like those of the original creditors. The payment of
money to them by Berry in this settlement, by receiving credit
for the previous payments with the stolen money, was precisely

the same as if he had paid the money into their hands in satisfaction of the debts. Through this settlement of the account, it became, as between Berry and the defendants, an ordinary case of the payment of a debt with stolen money to one who receives it in good faith from a person who is bound to pay it. This was a final settlement of all matters between Berry and the defendants, with a payment to them of a balance due. The payment and settlement were a reaffirmation by both parties of all previous payments entering into the account. The payment and settlement were governed by the same rules of law as the payments and settlements that satisfied the debts of the original creditors of the defendants. The payments covered by this settlement and included in it cannot be got back from the defendants, any more than from the former creditors of the defendants.

There is no evidence in the case that Berry, either as an individual or as a trustee of the Newell trust, ever transferred or attempted to transfer $6,522.70 of this stolen money, or any other part of it, to himself as a trustee of the Pickett trust, to be afterwards held and used by him for the benefit of the Pickett trust. There is nothing to indicate that he ever thought of making such a transfer. Upon the facts here shown, if he had attempted to make it by the formal expression of an intention to that effect, in the promotion of his criminal purposes, the attempt would not have imposed a liability upon these defendants, nor have affected the legal rights of anybody. The foundation of the plaintiffs' claim rests entirely upon the specific payments made by Berry to some of the creditors of the defendants, to some of the beneficiaries, and to his co-trustee.

The undisputed facts seem to bring us directly to the question whether we shall overrule the cases already cited, and disregard the universally recognized rule that a principal is not chargeable with the knowledge of his agent, acquired or used while acting adversely to the principal in the commission of a crime against him.

The only cases relied upon in the opinion on this point are *Atlantic Bank* v. *Merchants' Bank*, 10 Gray, 532, and *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268. The first of these was decided by three judges, while two others joined in a

dissenting opinion. A teller, who had embezzled a large sum from the bank where he was employed, expected an examination of his accounts upon a particular day. He entered into a conspiracy with a broker and the teller of another bank, to obtain from the other bank bills to be presented and used at the examination of his account, and afterwards to be returned to the other bank. Accordingly the broker drew a worthless check on the bank of the embezzling teller, which the teller certified as good. This was then presented at the other bank and there paid by the conspiring teller, and the bills were taken to the embezzling teller, who put them with the cash of his bank, where they were counted by the officers as a part of the bank's assets, on their examination of his account. The teller committed suicide the next day, the bills not having been returned, and, upon a suit by the bank from which they were obtained against the bank in which the teller left them, it was held that the property in the bills never passed to the defendant bank, that no consideration moved from the bank, that no one representing the bank ever had any knowledge of the matter, or acted in it, except the embezzling teller, and that he did not intend to pass any title to the defendant, or to do anything with the bills except to use them in committing a fraud upon it by having them counted as if they belonged to the bank, and that therefore the plaintiff could recover. Judges Bigelow and Merrick took a different view of this part of the case, but we assume that the majority were correct and that the case was rightly decided. After this view of the transaction had been fully elaborated in the opinion, and the decision put upon this ground, the writer of it, Chief Justice Shaw, said, "There is however another aspect in which the case may be considered "; and he then proceeded to argue that the defendant bank had constructive notice of the facts through its defaulting teller, and that it was chargeable on that ground. In this opinion, there is no reference to the doctrine that the knowledge of an agent engaged in the commission of a crime for his own benefit against his principal is not imputable to the principal, and seemingly the writer did not consider it. But two of the judges asserted it in their dissenting opinion. In my judgment there never was a stronger case than this for the application of the doctrine that, if the transaction had other-

wise been of a kind to give the defendant important rights in the money, it could not have been deprived of those rights by reason of the knowledge of its defaulting teller.   Upon the facts of the case there was no occasion to consider the question of imputed knowledge, and in no event could the bank be deprived of any rights by knowledge of this criminal in connection with the crime that he was committing against it.   This part of the opinion of the majority seems to me not only to be wrong, but to be everywhere contradicted by later decisions.

In the case of *Atlantic Cotton Mills* v. *Indian Orchard Mills,* *ubi supra,* it appeared that the same person was the treasurer of both the plaintiff and the defendant corporations, and was a defaulter to a very large amount.   It was found that the checks in dispute did not represent real transfers of money, or attempts really to transfer money.   They were a part of the fictitious transactions intended to enable the treasurer to cover up his defalcations.   A committee of the directors of each corporation made periodical examinations of his accounts.   In anticipation of an examination he would draw checks upon the other corporation, payable to the one whose assets were to be examined, and make false entries in his books, which checks and entries were intended simply to show assets and deceive the committee. There was no consideration for them.   They had no other purpose than to prevent discovery of the embezzlements.   No officer of either corporation, except the thief, ever had any connection with them or knowledge of them.   The decision of the court was unquestionably right, that there was no transfer of property from one corporation to the other by these checks and entries.   In this respect the case is precisely like the procurement of bills in the other case, for no other purpose than to exhibit them and have them counted and then return them.   The decision was put upon the ground that no property passed.

In this case, as in the former one, the writer of the opinion took up the question whether the plaintiff was, for any purpose, chargeable with notice of the facts upon which the defaulting treasurer was acting while committing these crimes upon the plaintiff, and in some parts of the discussion he used language implying that it might be so chargeable.   In my view, it is plain that the corporation could not be deprived of any of its rights by

charging it with the knowledge of its officer or agent, engaged
in the commission of a crime against it for his own benefit. If
the opinion is intended to show that the defendant corporation
had constructive notice of the facts known to the treasurer while
he was committing these crimes against it, I think it in conflict
with the later cases in Massachusetts, and in all other jurisdic-
tions of which I have knowledge.

I think the writer of the opinion had in mind, and was trying
to meet, a question of a very different kind. If the defaulting
treasurer, acting alone, did that which, on the books of the com-
pany, purported to create a debt, but which did not in fact
create a debt without participation or subsequent action of the
corporation or of some other representative of it, and if the cor-
poration afterwards attempted to adopt his act and give it effect
when it was ineffectual, it could not do this without also adopt-
ing his knowledge. The judge said in the opinion: " Under these
circumstances, if the plaintiffs would adopt the intention to make
it a payment, it must also adopt the fraud. It cannot adopt so
much of Gray's act as was beneficial and reject the rest." This
was undoubtedly correct. If the unauthorized or ineffectual act
of an agent is to become effectual through the ratification of the
principal, the ratification must be of the act as it is. If the
principal afterwards says he was ignorant of certain features of
the act which affect its quality, and that he is not bound by
these features of it, this is equivalent to saying that, by reason
of his ignorance, there was no effectual ratification or adoption,
and he cannot take advantage of the act at all. As the judge
said in this opinion (page 281), " it cannot blow hot and cold."
In reference to such an attempt of a principal his agent's knowl-
edge would be imputable to him. I think this is all the judge
meant in this part of the opinion. But this is very different
from a statement that a corporation which, acting innocently,
has received the benefit of a transaction that has taken com-
plete effect through its agent's own act, and that from its point
of view is entirely valid, like the payment of one of its debts for
which payment it has given full consideration, is chargeable with
the knowledge of its agent who received money to make the
payment and who then made it with stolen money, for his own
benefit, as a part of a course of crime which he was pursuing

against the corporation. It is not in conflict with the proposition above quoted, that a principal cannot be deprived of the act of an agent which is complete, and legally and equitably valid from the standpoint of the principal's rights, because of the knowledge of the agent in the commission of a crime against the principal.

In each of these two cases there was nothing that has any relation to the present case, except the discussion as to constructive notice. In each the discussion was upon a point outside of the principles on which the decision rests. In each of them it was decided that the title to the property never passed. In the present case, in the payment of every debt there was both an intentional and an actual transfer of the money for a valuable consideration. The different interests in the transaction were represented by different contracting parties qualified to act. Berry represented himself primarily, and the defendants secondarily in making the payments. The creditors represented themselves in receiving the payments; and in discharging the debts they acted for themselves, but primarily for Berry's benefit and secondarily for the benefit of the defendants. The effect of Berry's acts in making the payments originally, and the effect of his subsequent act in settling with the defendants, was not suspended to await ratification or adoption by the defendants long afterwards.

The plaintiffs have proceeded upon an assumption that the title to the money passed to the persons to whom the payments were made, and they ask to be subrogated to the rights of those persons. I think it would be unfortunate to adopt into our law any dicta from either of these cases that are in conflict with the general course of decision, both here and elsewhere.

I think that the decision in *Craft* v. *South Boston Railroad*, 150 Mass. 207, 210, covers exactly the questions in this case. (See also *Allen* v. *South Boston Railroad*, 150 Mass. 200.) It was made upon grounds that are as applicable to a suit in equity as to an action at law. The attempt, in the opinion of the majority, to distinguish it from the present case does not seem to me successful. I think the sentence, " Whether it was a benefit to the company that he was able to obtain and use money for this purpose is necessarily uncertain," is merely an incidental remark,

and not a statement of a ground of the decision. If there was this uncertainty by reason of the fact that the defaulter afterwards continued his stealing, that did not affect the plaintiffs' right to recover. This right was to be determined as of the time when the payment was made, and it could not be affected by the fact that the embezzler did or did not steal more money afterwards. I do not think that the court decided or thought of deciding that the rights of the parties depended upon the results of Reed's transactions taken as a whole, those that occurred after the payments made with the plaintiffs' money, as well as those that occurred at the times of the payments or previously.

Moreover, in this particular the facts in the present case are the same. Berry continued his embezzlements from the defendants afterwards, until they amounted to more than $8,000, in addition to those made before. By the payment of these debts, presumably he was enabled to steal more money from the defendants. In the present case " no benefit" enured " to the defendants from all of the defaulter's transactions taken as a whole." Berry never paid a dollar for the benefit of the defendants beyond the amount of the defendants' money which was in his hands for that purpose, and for which the defendants were entitled to credit and received credit in the settlement with Berry. In the language of the present opinion " no benefit can be said to enure to a defendant because one of its debts was paid in the course of a series of thefts which the defaulter was enabled to continue by the payment in question."

The case of *Title Guarantee & Trust Co.* v. *Haven*, 196 N. Y. 487, relied upon in the opinion, seems to me to support the contention of the defendants. It holds that there can be no subrogation where there was no lien but only a personal liability for a debt. What is far more important than this, it distinctly holds that in a case like the present there can be no recovery. The court said in the opinion: " It must be distinctly understood that this view is predicated upon the assumption that the payment of the assessments was purely gratuitous and in no wise in discharge of any real or substantial obligation upon the part of the estate of Andrew H. Green or of the unknown forger, but was brought about solely by mistake induced by the forgery. Upon this assumption we think that the plaintiff on proof of

the facts stated in the complaint would be entitled to be subrogated to the lien of the city as against the proceeds of the sale of the land in the hands of the defendants. If, however, it should be made to appear that the payment was not thus gratuitous, we are of opinion that the right of subrogation could not successfully be asserted." In the present case the payments were not gratuitous, but made by one who was legally bound to make them.

The cases from the English courts, relied upon in the opinion, I do not consider important. *Bannatyne* v. *MacIver*, [1906] 1 K. B. 103, was an action upon a bill of exchange for money borrowed by the defendant's agent, in excess of his authority. The money was deposited in the defendant's bank account, and much of it was used in his business, in payment of his debts. There was no charge of criminality against the agent, nor any contention that in doing the business and paying the debts he acted otherwise than in the name of the principal, or that any debt was paid as one for which the agent was primarily or legally liable. So far as appears, there was no reason why the defendant should not be charged with the knowledge of his agent that money furnished by the plaintiff was being used in making the payments. There were no facts upon which to raise the questions that I have principally discussed, and they were not considered.

The decisions that one lending money to a married woman or a minor, to be used in paying for necessaries, may take advantage in equity of the fact that the money was actually used in buying necessaries, stand, in my judgment, upon equities of a different kind. The same is true of the decisions which hold a corporation to payment for money borrowed without authority of law if the money was afterwards appropriated and used by the corporation for its benefit. These illustrate equitable limitations of the common doctrine of *ultra vires*. Moreover, none of these cases, in my judgment, has any relation whatever to the vital question in this case, that arises when a payment of a debt has been made in money, by a person who ought to make it, to one who receives the money in good faith and discharges the debt for the benefit of the payor, and of the defendants who are liable secondarily for it, and when, subsequently, the defendants

in good faith have settled the payor's account with him and have given him credit for the payment, they having formerly furnished him money with which to make it, and when long afterwards, it is discovered that the payor misappropriated the money furnished by the defendants, and then paid the debt with money stolen from another person. This question is whether the debt, once satisfied, can then be revived in favor of that other person, and the defendants be compelled to pay it a second time.

I think that the defendants are entitled to retain the benefit of these payments, for which they gave full value, just as the original creditors are entitled to retain the benefit of them, and for the same reason.