WILLIAM D. CHAPPLE, administrator *de bonis non* with the will annexed, *vs.* MERCHANTS NATIONAL BANK.

Essex.    May 11, 1933. — October 7, 1933.

Present: RUGG, C.J., PIERCE, WAIT, FIELD, & LUMMUS, JJ.

*Agency*, Fraud of agent, Agent's knowledge.  *Bank*.  *Corporation*, Officers and agents.  *Executor and Administrator*.  *Fraud*.

When a bank, through the hands of its officer acting in that capacity, receives funds of a third person or funds which are the proceeds of the sale of property of a third person, which funds have been procured by such officer through his own fraud, and no other officer of the bank knows the facts, the bank does not acquire a good title to the funds against the true owner.

In the circumstances above described, the bank cannot claim the benefit of its officer's fraud upon others and disclaim the knowledge which he had: if it undertakes to profit by his act, it must adopt that act as a whole.

The liability of the bank in the circumstances above described is the same, although its fraudulent officer may have been acting as agent for a third person or as executor of the will of a third person, unless the fraudulent officer was expressly authorized to deal with the bank as the third person's agent, or as executor, and unless, if he did so, other officers of the bank had an intelligent appreciation of the transaction and knew that he was acting as agent for another; that is, that he had ceased to act as agent for the bank.

An action of contract by an administrator with a will annexed against a national bank was heard upon the report of an auditor as the only evidence.  It appeared that the bank had authority to act in any "fiduciary capacity in which state banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the state of Massachusetts," and that, "for the accommodation of customers and as a benefit to itself in meeting competition and attracting and holding depositors, [it] maintained a department for effecting the purchase or sale of securities for persons desiring such service"; that a widow, who was a customer of the bank and was confined to her home, employed an

assistant cashier of the bank, who was in charge of its securities department, as her "trusted man of business"; that by fraud he procured possession of securities of hers and sold them through brokers, used by him as the bank's officer in charge of its securities department for a very large number of transactions other than those which were the subject matter of the action, many of them being business transactions properly authorized; that the brokers by mail remitted proceeds of the sale of the securities by checks to the order of the bank; that the fraudulent assistant cashier opened the mail, caused the checks to be deposited to the credit of accounts of other customers of the bank whom he had defrauded or to an account in his name as agent for the bank to cover up irregularities therein; that later the widow died and the assistant cashier became executor of her will, and that he continued his fraudulent conduct by use of securities of the estate which thus came into his possession.  The auditor found: "No other officer or representative of the bank participated in any way in the transactions described . . . except tellers, bookkeepers or clerks performing their routine duties without knowledge of any irregularity"; and that in sending the widow's securities for sale the fraudulent assistant cashier acted as her agent or as executor, but that in the application of the proceeds of the securities received at the bank he acted as an officer of the bank and by virtue of his position as such officer.  *Held*, that a finding for the plaintiff was warranted.

The defendant in the action above described contended in substance that the plaintiff had failed to prove that the transactions of the fraudulent assistant cashier as a whole had resulted in a benefit to the defendant because the payments which he had made to various accounts with the bank to cover his defalcations had enabled him by this covering to prolong his operations and to steal more than was paid to the bank.  It appeared that the fraudulent transactions of the assistant cashier for which the auditor held him accountable began on May 6, 1929, and ended on December 19, 1930.  The auditor reported that he was unable to find to what extent this prolongation resulted in losses to the bank heavier than would otherwise have occurred; and that, after November 8, 1929, the bank was negligent in not observing fraudulent conduct of its assistant cashier with the natural result that its negligence resulted in "a failure to discover earlier and stop further misappropriations of the" money which was the subject matter of the action.  *Held*, that

(1) In the circumstances the burden should be on the defendant to prove that ultimately there was no benefit to it because it allowed its assistant cashier to steal further sums greater in amount than those paid to the defendant or used to purchase stocks for it;

(2) Aside from the burden of proof, the evidence failed to show that the benefit to the defendant in the form of bank credits or otherwise was no benefit at all because it enabled its assistant cashier to continue his stealings to any determinable amount;

(3) The defendant itself having been responsible because of its negligence in permitting the prolongation of the defalcations of its assistant cashier, it could not reasonably be said that the benefit from

credits set up from the proceeds of the securities, which proceeds the plaintiff was seeking to recover, was wholly or in part no benefit at all because they gave an opportunity to inflict further losses on the defendant.

In the action above described, it appeared that after the sale by the brokers of securities, the proceeds of which the plaintiff was seeking to recover, the fraudulent assistant cashier of the defendant directed the brokers to apply the proceeds in payment for the purchase of securities ordered and paid for by customers of the bank. The defendant sought to avoid liability on the ground that the maintenance by it of a securities department for use of its customers was *ultra vires*. *Held*, that whether the maintenance of such a department was or was not *ultra vires* was immaterial and did not affect the defendant's liability.

It was no defence to the action above described that the application by the fraudulent assistant cashier of some of the misappropriated funds to satisfy other obligations of the defendant was done without the defendant's knowledge or consent.

As to some of the checks remitted by the brokers to the defendant bank, the auditor found merely that they were deposited to the defendant's credit at the Federal Reserve Bank. *Held*, that benefit received by the defendant, sufficient to fix liability upon it, was shown.

A group of items for which the defendant was held liable in the action above described represented the amounts of checks drawn by the fraudulent assistant cashier against the estate of which he was executor and used by him to procure checks of the bank with which he had bought securities for other persons who had ordered him to purchase securities and whose accounts he previously had charged with the purchase price although he had not made the purchases ordered. *Held*, that the defendant was liable for such items because through its assistant cashier it had used trust funds of the estate for its own purposes and to satisfy its own obligations, and it could not accept and use them and disclaim the knowledge which its agent had.

Although, as to some of the transactions of the defendant's fraudulent cashier respecting which the plaintiff was seeking recovery in the action above described, the bank in no way benefited, its liability was established because they occurred after, according to the auditor's finding, the defendant was guilty of negligence which resulted in its failure to stop the misappropriations: the bank was liable in failing to discover the fraud of its officer and was chargeable with constructive knowledge of his dishonest acts.

A bank might not be liable for a single act of fraud or crime on the part of an officer or agent, while it would be for a continuous course of fraudulent practice, especially those so openly committed and easily detected as shown by the findings of the auditor in the action above described.

In the action above described, it was proper for the judge to refuse to rule that "Until the claim is merged in a judgment interest runs only at the rate paid by the bank on deposits," and to find for the plaintiff in the principal amount of the items established by the rules

of law above set out, adding thereto interest at six per cent from the date of each remittance to the defendant of funds wrongly procured from the plaintiff's testate and her estate by the defendant's assistant cashier.

CONTRACT OR TORT. Writ dated January 15, 1932.

The action was referred to an auditor.

Items allowed the plaintiff were for dates beginning May 6, 1929, and ending December 19, 1930.

The complete findings of the auditor as to Punchard's dealings with Spinney funds respecting the North Shore Babies Hospital were as follows:

"In December, 1930, Hornblower and Weeks received from Punchard for sale two Associated Chain Store Realty Company bonds of $1,000 each belonging to the estate. Hornblower and Weeks sold them and remitted the proceeds, $1,450.27, by their check dated December 19, 1930, with a letter of transmittal addressed to the bank. At the bank Punchard caused the sum of $1,450.27 to be credited as follows: by two respective deposit slips, both dated December 19, 1930, both made out by him, $450.27 to the account of Salem Chamber of Commerce and $1,000 to the account of North Shore Babies Hospital. The credit of $450.27 to the Chamber of Commerce account was to repair in part Punchard's irregularities in it.

"Punchard was then assistant treasurer of North Shore Babies Hospital with authority to draw in its name against its account at the bank. On September 22, 1930, he, to repair in part his irregularities in the account of Elizabeth D. Anderson had transferred $2,625 to her account from the Hospital account. Two days later he repaired in part the shortage so caused in the Hospital account by causing $1,625 to be transferred to the Hospital account from the Punchard Agent account and completed the repair with the above credit of $1,000 to the Hospital account on December 19, 1930. At no time herein concerned was the Hospital account overdrawn. The above sum of $1,000 of estate money went to the Hospital account to make good an improper transaction by Punchard not as an officer of the bank but as an officer of the Hospital. The amount

improperly transferred by Punchard from the account of the North Shore Babies Hospital to the credit of Elizabeth D. Anderson was debited by the bank against Elizabeth D. Anderson in its accounting with her, and to that extent reduced the bank's liability to Mrs. Anderson. In so far as the questions are for me, I find that the bank was not liable to the Hospital on account of Punchard's transfer of $2,625 from the Hospital account to the Anderson account and, therefore, could not be and was not, indemnified against such liability by Punchard's deposit of $1,000 of estate money to the credit of the Hospital. Finding, in so far as the question is one of fact, upon the facts stated in this report and any and all permissible inferences to be drawn therefrom, and, in so far as the question is one of law, ruling, — as I do — that the diverting of the estate money, remitted in a check drawn to order of the bank, from the estate to another for any purpose was, and could only be, done by Punchard as an officer of the bank and by virtue of his position as such officer, I find the bank liable for the whole amount of $1,450.27."

The auditor's findings as to "item 31," referred to in the opinion, were as follows:

"In April or May, 1930, Hornblower and Weeks received from Punchard for sale five Transportation Building bonds of $1,000 each, belonging to the estate. Hornblower and Weeks sold them and remitted the proceeds, $4,150.97, by their check, dated May 2, 1930. At the bank Punchard by a deposit slip dated May 3, 1930, made out by him, caused the sum of $4,150.97 to be credited to the account of the estate and on the same day wrote a check of the bank by himself as assistant cashier for the same amount to the order of Hornblower and Weeks. This last mentioned check was duly negotiated by Hornblower and Weeks and honored by National Shawmut Bank on which it was drawn. On May 3, 1930, Punchard caused the Punchard Agent account to be charged $1,166.07 and remitted that amount to Hornblower and Weeks. The three sums, to wit, $3,202.96 reported in the next prior item, $4,150.97 and $1,166.07, both in this item, aggregating

$8,520, were used by Hornblower and Weeks at Punchard's order to buy the one hundred shares of General Electric stock for Mrs. Carroll as reported in the next prior item. Mrs. Carroll was short the one hundred shares of General Electric.  On May 3, 1930, the date of the above bank check for $4,150.97, the account of the estate at the bank was charged with exactly that sum.  Punchard as executor drew many checks against that account but failed to keep a complete record of such checks or to preserve all of the cancelled checks.  On the evidence it is impossible to state whether he drew the sum of $4,150.97 aforesaid from the estate account by check as executor or caused it to be transferred, without check, by virtue of his position as assistant cashier.  In either case, a reasonably careful scrutiny of the Punchard Agent account, constantly before officers of the bank other than Punchard because of overdrafts, should have put the bank sufficiently upon its inquiry to discover the misappropriations in this item.  Also, in so far as the question is one of fact I find, and in so far as it is one of law I rule, that the bank was charged with knowledge of them through Punchard as its assistant cashier."

Other material facts found by the auditor are stated in the opinion.  The action was heard in the Superior Court by *Gray,* J., without a jury, upon the auditor's report without further evidence.

The defendant made requests for rulings, the first thirteen of which were that the plaintiff was "not entitled to recover with respect to the items in" any one of the "groups" described in the auditor's report and in the opinion.  Each of these requests was refused.  The remaining requests, with the action of the judge thereon, were as follows:

"As to Transactions during Mrs. Spinney's Life.

"14. Punchard was Mrs. Spinney's agent in sending her securities to the brokers for sale and in receiving the checks in payment.  He was accountable to her, not to the bank, for the checks."  The judge ruled: "On the findings of the

auditor he received and applied the checks as the agent of the bank. The fact that he also was accountable to Mrs. Spinney does not relieve the bank from liability."

"15. If the checks received had been payable to Mrs. Spinney, Punchard in indorsing them to the bank and handing them to the teller with deposit slips would plainly have been acting solely as Mrs. Spinney's agent, and the mere fact that the checks were made payable to the bank did not make Punchard the agent of the bank in depositing them." The judge ruled: "It is not necessary to pass upon this request based upon facts not in evidence."

"16. It is not correct to say that Punchard could deposit the checks as he did only as an officer of the bank." The judge ruled: "This is immaterial since the auditor also finds that as a fact Punchard deposited the checks as an officer of the bank."

"17. If a check be made payable to a bank any one, at least if known to the bank, can deposit it to any account he sees fit." The judge ruled: "Only with the consent of the bank or the direction of the owner of the account."

"18. In depositing the checks Punchard did no more than any agent of Mrs. Spinney, not connected with the bank, could have done." Refused.

"19. The bank received the money through its teller, not through Punchard, who as agent of Mrs. Spinney was the depositor." Refused.

"20. The bank in receiving the checks was not charged with Punchard's knowledge." Refused.

"21. In his irregularities in connection with the accounts other than those of Mrs. Spinney and the North Shore Babies Hospital Punchard did not affect the amount of the bank's obligations to the other depositors but in fact stole from the bank." Given.

"22. The defendant is not liable for the amount of the checks deposited to the credit of Punchard, Agent which were so deposited as to enable Punchard to utilize the proceeds for his own benefit and where the amounts were so used before the defendant knew anything about the matter." Refused.

"23. In using the checks as he did Punchard was embezzling property of Mrs. Spinney." Given.

"24. With respect to the items in group 3, the misapplication of the checks received from the brokers was the act of Mrs. Spinney's agent." Refused.

"25. With respect to the items in group 5, Punchard was acting as Mrs. Spinney's agent in giving directions to the brokers with regard to the application of the proceeds of the sale of Mrs. Spinney's securities." Refused.

"26. With respect to the items in group 6, transfers of money from an account on which Punchard had a power of attorney to draw to another account which he controlled and used for his own benefit imposes no liability on the defendant." The judge ruled: "Refused on all the findings with respect to group 6."

"After Mrs. Spinney's Death.

"27. The checks received from the brokers belonged to Punchard as executor and in handing them to the receiving teller he was acting as executor and was liable on his bond as such for misapplying the checks." The judge ruled: "On the auditor's findings he was acting as the bank's agent in applying the checks. The fact that he is liable on his bond as executor does not relieve the bank from the liability established by the auditor's findings of fact."

"28. With respect to the items in group 8, Punchard as executor placed the money to the credit of an account which he personally controlled and proceeded to steal the money, acting throughout, not as an officer of the bank, but as an embezzler of funds in his control as executor." Refused.

"29. With respect to the items in group 10, Punchard acted as executor in directing the brokers with regard to the application of funds which belonged to him as executor." Refused.

"30. With respect to the items in group 11, Punchard made a wrongful use of the estate account which was his as executor, and did not act as an agent of the bank so as to charge the bank with his knowledge." Refused.

"31. With respect to the items in group 11, it is not enough that the bank should have been put upon inquiry so long as it had no actual notice of Punchard's irregularities." Refused.

"32. With respect to the items in group 12, the checks or charges were all instances of improper dealing by Punchard as executor with an account belonging to him as such, and they were not acts of the bank." Refused.

"33. With respect to the items in group 13, they were all instances of improper acts as executor, the misuse of the estate funds not being an act of the bank and the bank not being chargeable with knowledge of Punchard's misuse of the estate money." Refused.

"34. If Punchard had sold securities of his own and had handed the check received from the brokers to the receiving teller for deposit he would have been acting as a depositor in the bank, not as an officer of the bank, and the same is true with respect to his dealings with checks received for securities sold by him as executor." The judge ruled: "This request not being based on facts in evidence need not be passed on."

"*As to Transactions Both Before and After Mrs. Spinney's Death.*

"35. The negligence of officers of the bank as found by the auditor does not charge the bank with liability and is immaterial in this case." The judge ruled: "The finding for the plaintiff is not based upon negligence but is on the contract counts."

"36. The bank is not liable in this case on the ground that it received the proceeds of the checks or on the ground that obligations owed by it were satisfied by the use of the Spinney money, for the reason that no benefit enured to the bank from all of Punchard's transactions taken as a whole, and consequently no benefit can be said to have enured to the defendant from any one of the transactions." Refused.

"37. When no benefit enures to the defendant from all of a defaulter's transactions taken as a whole no benefit can be said to enure to the defendant because one of its debts was paid in a series of thefts which the defaulter was enabled to continue by the payment in question." Refused.

"38. In the case of money deposited in the Punchard, Agent account and drawn out by Punchard for his own purposes before the bank had any knowledge of his irregularities, the bank is under no liability." Refused.

"39. The maintenance by the defendant of the department for the purchase and sale of securities for its customers is *ultra vires*." The judge ruled: "This is immaterial since the question of *ultra vires* cannot affect the defendant's liability to the plaintiff."

"40. As a national bank has no authority to buy or sell shares of stock or rights to subscribe therefor the maintenance of the Punchard, Agent account as an account of the bank itself was *ultra vires*." The judge ruled: "Immaterial."

"41. If the bank is liable on any items it is liable for interest, before the date of the demand, only at the rate paid by the bank on deposits." Refused.

"42. Until the claim is merged in a judgment interest runs only at the rate paid by the bank on deposits." Refused.

The judge filed the following statement:

"This trial falls within Rule 88 [of the Superior Court (1932)] and, being upon the auditor's report only, may be had by motion for judgment on the report. There being no contradictory evidence the auditor's findings of fact must stand. In so far as he makes findings of fact as inferences from other facts found I find and rule that they are correct. I therefore allow the within motion and order judgment for the plaintiff on the auditor's report with interest computed in accordance with the second or alternative method set forth in the auditor's report. I rule that it is unnecessary for the court to pass upon the various requests for rulings where the case is tried in this manner but have indicated my views on the requests of the defendant filed herewith."

The judge reported the action for determination by this court.

*R. G. Dodge,* (*J. M. Raymond* with him,) for the defendant.

*R. H. Wiswall,* (*W. D. Chapple* with him,) for the plaintiff.

PIERCE, J.   This is an action of contract or tort to recover for losses incurred by the plaintiff's testatrix and her

estate arising out of alleged misconduct of one R. A. Punchard who was an assistant cashier of the defendant.

The case was referred to an auditor who filed a report. Thereafter the case came before a judge of the Superior Court sitting without a jury. The plaintiff introduced the auditor's report and rested. The defendant introduced no evidence. Each party submitted requests for rulings and the plaintiff also submitted a motion for judgment in his favor. The judge found the facts were as stated by the auditor in his report, and found and ruled that in so far as the auditor made findings of fact as inferences from other facts found they were correct; that the plaintiff was entitled to recover in accordance with the auditor's findings, and ordered "judgment for the plaintiff on the auditor's report, with interest at six per cent from the dates upon which the respective remittances reached the bank in accordance with the second or alternative method set forth in the auditor's report." The parties filed a stipulation agreeing upon the amounts of interest "computed upon the respective amounts found for the plaintiff and upon the credit items allowed to the defendant in accordance both with the first method of computation of interest set forth in the auditor's report and also in accordance with the second or alternate method," which the judge adopted as the correct method.

The defendant duly excepted "to the denial by the court of its requested rulings numbers 1 to 20, inclusive, 22, and 24 to 42, inclusive," to the ruling "that the inferences drawn by the auditor from the facts found by him are correct; and to the order of judgment for the plaintiff on the auditor's report with interest computed in accordance with the second method set forth in the auditor's report." The judge, "At the request of the defendant and with the assent of the plaintiff," reported the case to this court, "such judgment to be entered as the law requires."

The auditor's report discloses the following facts: The plaintiff, on June 15, 1931, was duly appointed by the Probate Court for the county of Essex administrator with the will annexed of the estate not already administered of

Annie G. Spinney, who died February 11, 1930, testate.
The defendant is a banking corporation duly established
under the laws of the United States and having its place of
business in Salem, Essex County.   Ralph A. Punchard, of
Salem, was on March 13, 1930, appointed by said Probate
Court executor of Mrs. Spinney's will and held that office
until he was removed therefrom on May 25, 1931, by order
of the court.   Punchard was also assistant cashier of the
bank for approximately ten years ending in May, 1931.
"During the period concerned in this action the bank had
a permit from the Federal Reserve Board, dated December
4, 1918, under Act of Congress of December 23, 1913, c. 6,
§ 11, granting to the bank 'the right to act as trustee,
executor, administrator, registrar of stocks and bonds,
guardian of estates, assignee, receiver, committee of es-
tates of lunatics, or in any other fiduciary capacity in
which state banks, trust companies, or other corporations
which come into competition with national banks are per-
mitted to act under the laws of the state of Massachusetts.'"
During this period, conforming to the practice of numerous
other banks in the county of Essex, the defendant bank
"for the accommodation of customers and as a benefit to
itself in meeting competition and attracting and holding
depositors, maintained a department for effecting the pur-
chase or sale of securities for persons desiring such service."
Punchard as one of two assistant cashiers of the bank was
in charge of this department from 1923 until May, 1931.
"All persons seeking such service were referred to him."
In the case of purchase or sale of stocks a "service charge"
was made, and in the case of bonds a regular broker's com-
mission was charged.   "The cost of securities so purchased
. . . was charged by the bank to the customer and billed
to the bank by the brokers, who looked to the bank for
payment"; and the "proceeds of securities so sold were
remitted by the brokers to the bank."   "It was within
Punchard's authority and a part of his duties as head of
this department to deal with and apply funds remitted to
the bank from brokers representing the proceeds of the sale
of customers' securities."

The defendant bank was also the depositary in Salem of the New England Telephone and Telegraph Company. It therefore created a deposit account "for the sale and purchase of 'rights' on the stock of the telephone company, Boston Edison rights and other rights." In this branch the bank, not acting as the agent of the customers, bought or sold the rights and paid for them with checks signed by Punchard, agent, or deposited money to the credit of that account. This account was called the "R. A. Punchard, Agent Account" because Punchard as an officer of the bank "had full control" of it. Punchard had "no legitimate personal interest in the account" and "acted as the agent of the bank." "Withdrawals from this account could be made only by checks signed by Punchard, Agent, or by charge tickets signed by him or by any other officer of the bank. The money credited to this account, not segregated in any way, was mingled with the general commercial funds of the bank."

Mrs. Spinney was a widow, confined to her home. She and her husband had been customers of the bank for a considerable time prior to the death of her husband and thereafter she continued as one of its customers. The bank and the judge of probate recommended Punchard "as an excellent man to take care of her affairs" and he became her "trusted man of business." From May 1, 1929, to October 26, 1929, she had a safety deposit box at the bank which could be opened by her key and a guard key at the bank. Punchard, as an officer of the bank, "had, properly and regularly, such a guard key." Between October 26, 1929, and April 9, 1930, Mrs. Spinney frequently sent her niece to this safe deposit box. On these occasions Punchard selected "a time when the special attendant or guard of the boxes was off duty," left the niece in the front part of the bank, used his guard key and Mrs. Spinney's key to open the box, and took advantage of the opportunity to remove from it such bonds and securities as he desired. On some occasions he removed securities from the inner box in the niece's presence, laid them to one side or put them in his pocket, saying to the niece "that Mrs. Spinney had re-

quested some dealing with those securities." Mrs. Spinney died on February 11, 1930, leaving a will under which Punchard was appointed executor by the Probate Court. From April, 1930, as executor Punchard had occasion to go to the safety deposit box without the attendance of any other person. Punchard disposed of the securities, which were either bonds, apparently negotiable, or stock certificates indorsed by Mrs. Spinney in blank, or by him as executor, by sending them to Hornblower and Weeks to be sold. This firm was used by Punchard, as officer in charge of the defendant's securities department, for a very large number of transactions other than the Spinney matter, many of them being business transactions properly authorized. Another firm of brokers had been regularly employed by the bank and for this reason the bank president, learning of the matter in the fall of 1929, had told Punchard not to employ Hornblower and Weeks except when requested to do so by a customer. Punchard disregarded this order and continued to employ that firm without the knowledge of any officer of the bank. However, all the business was effected by these brokers for the account of the bank, and in "a space of only six months from May 11, 1929, over one hundred letters and statements were sent addressed to the bank and were received at the bank including nine letters calling attention to overdue balances. During this period also cashier's checks were drawn payable to Hornblower and Weeks and there were entries relative to Hornblower and Weeks in the general ledger of the bank." Punchard would get hold of the mail and deliver the brokers' checks to the receiving teller, would direct that they be deposited to the credit of accounts of various depositors from which he, by virtue of his official position, had made irregular withdrawals. On many occasions the teller was directed to credit the "Punchard, Agent," account. The proceeds of some sales were traced not otherwise than as deposits to the defendant's credit in the Federal Reserve Bank. At other times Punchard directed the brokers to use the proceeds to purchase securities which the defendant was under obligation to deliver to customers, but which

obligation it had not fulfilled because Punchard, the one to act in the premises, had stolen the money paid over for the purpose or was short in customers' accounts. "No other officer or representative of the bank participated in any way in the transactions described . . . except tellers, book-keepers or clerks performing their routine duties without knowledge of any irregularity."

The auditor found that in sending securities for sale Punchard "acted as the agent of Mrs. Spinney or as the executor," but in the application of the proceeds of the Spinney securities received at the bank he acted as an officer of the bank and by virtue of his position as such officer; that it was within Punchard's authority as an officer of the bank to issue these cashier's checks and in doing so he followed the method practised at the bank for the issuance of checks for legitimate purposes.

We shall consider the various alleged irregularities of Punchard in connection with the Spinney account in more detail in combination with the various "groups" reported by the auditor in so far as they present a common question of law.

Groups 1, 2, 7 and 8 include cases in which securities belonging to Mrs. Spinney or to her estate were sent or delivered to brokers for sale and the proceeds, remitted by check on various Boston banks to the defendant's order, were by Punchard's direction credited to the accounts of various depositors or to the "Punchard, Agent," account. In every case this credit was to repair an irregularity by Punchard in the account — an irregularity in respect to which the defendant bank would have to stand the loss. A typical example of Punchard's methods, taken from the auditor's report, is illustrated by the following statement of fact: "On September 4, 1929, Punchard sent to Hornblower and Weeks for sale thirty shares of Peoples. Drug Co., belonging to Mrs. Spinney and previously indorsed by her in blank. Hornblower and Weeks made the sale and remitted the proceeds, $2,527.80, by their check dated September 5, 1929, with a letter of transmittal ad-

dressed to the bank. At the bank Punchard caused the sum of $2,527.80 to be credited by deposit slips, made out by him" to the account of four different persons. "All of these credits were made to repair wholly or in part irregularities of Punchard in the respective accounts." On these and similar facts included in groups 1, 2, 7 and 8 of the auditor's report it is clear the plaintiff is entitled to recover. *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268. *Atlantic Bank* v. *Merchants' Bank*, 10 Gray, 532. *Metropolitan Trust Co.* v. *Federal Trust Co.* 232 Mass. 363. *Loring* v. *Brodie*, 134 Mass. 453. *Skinner* v. *Merchants' Bank*, 4 Allen, 290. *Tremont Trust Co.* v. *Noyes*, 246 Mass. 197. These decisions rest upon the doctrine that when a corporation receives funds belonging to a third party through the hands of its officer acting in that capacity, who knows that the funds have been wrongfully obtained from the owner and no other officer knows the facts, it does not acquire a good title to the money against the true owner. It cannot claim the benefit of the agent's fraud and disclaim the knowledge which the agent had. The defendant contends that the case at bar is totally unlike *Atlantic Bank* v. *Merchants' Bank*, 10 Gray, 532, and *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268, in that in those cases the defaulter used the money of another, temporarily, to conceal his defalcation, that in receiving the money he was the sole representative of the corporation and the corporation was not only chargeable with his knowledge but had no right whatever to receive the money. "In the present case the defendant did have a right to receive the checks as they were handed it for deposit by the agent of the party entitled to it or, after Mrs. Spinney's death, by the party himself, temporarily dealing with the bank and not acting for it. The fact that the agent violated his duty to his principal by the directions he gave, or that, when depositing as executor, he committed a breach of trust does not charge the bank with responsibility."

The contention of the defendant that this is a case falling within the principle that when an officer of a bank makes

a deposit or acts as agent for a customer in making deposits or in drawing checks he must be regarded as dealing with the bank and not for it, so that the bank is not responsible for his acts or chargeable with his knowledge, *Stallo* v. *Wagner*, 233 Fed. Rep. 379, *Hilliard* v. *Lyons*, 180 Fed. Rep. 685, *Downing* v. *Lane County State & Savings Bank*, 133 Ore. 322, must be taken with the qualification that the officer of the bank was expressly authorized to deal as the depositor's agent, and that, if he dealt with 'the bank, other officers of the bank had an intelligent appreciation of the transaction and knew that he was acting as agent for another; that is, that he had ceased to act as agent for the bank. *American National Bank of Nashville* v. *Miller*, 229 U. S. 517. See *Indian Head National Bank* v. *Clark*, 166 Mass. 27, 30. The contention of the defendant is also subject to the rule that "where one undertakes to profit by the act of another as agent, he must adopt that act as a whole and take the bitter with the sweet." *Tremont Trust Co.* v. *Noyes*, 246 Mass. 197, 207. See *Indian Head National Bank* v. *Clark*, 166 Mass. 27, for a discussion of the limitation of this rule, where the agent was defrauding his own principal and had an adverse interest to it, or where the officer of the corporation was not the sole representative in the transaction or where he did not act in his capacity as agent of the corporation.

Laying to one side the finding of the auditor that "Punchard's ability to use Spinney money and estate money and his misuse of both in repairing wholly or in part his irregularities in the accounts of other customers and in the 'Punchard, Agent,' account were two of the factors which, together with other factors" stated in the report, enabled Punchard "to prolong his wrongdoing," the case is covered by the cases hereinbefore cited of *Atlantic Bank* v. *Merchants' Bank*, 10 Gray, 532. *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268. *Metropolitan Trust Co.* v. *Federal Trust Co.* 232 Mass. 363, and cases cited. The situation here is that the plaintiff's money produced bank credits available to the defendant, established by checks drawn by the brokers on their own banks to the order of

the defendant; since the brokers so wrote the checks it would seem that legal title to them was in the bank even though Punchard sold the securities as agent for Mrs. Spinney or as executor. There would appear to be no reason why the defendant should not be liable for them when paid in an action for money had and received to the use of the plaintiff. Punchard was the agent through whom the bank got the money, and if it repudiates his agency it can show as against the plaintiff no title which in good conscience it can set up against the plaintiff. If, on the other hand, the bank claims the benefit of Punchard's acts as the acts of its agent it must in addition accept the burden of Punchard's knowledge of the origin of the brokers' checks. *Tremont Trust Co.* v. *Noyes,* 246 Mass. 197, 207, distinguishing anything appearing *contra* in *Indian Head National Bank* v. *Clark,* 166 Mass. 27. Ratification of Punchard's acts in disposal of the brokers' checks might reasonably be inferred from the defendant's refusal to turn over the proceeds to the plaintiff, but the auditor states that "After the discovery of Punchard's frauds by the bank in May of 1931, the bank made up statements of account as between the bank and all its customers who had been affected by Punchard's irregularities and in its accounts with such customers, including those customers whose accounts had been balanced as well as those whose accounts were still short, the bank debited the customers with all amounts credited to their accounts by Punchard represented by Spinney money or transfers from the 'Punchard, Agent,' account, and with the cost of stock purchased for such customers by Punchard with Spinney money. Such debits to these customers reduced *pro tanto* the credits stated in favor of such customers, and the bank received the benefit of such debits in its accounts with them." This was a repudiation of Punchard's acts so far as they were done in behalf of the bank.

The contention of the defendant that it is not liable to the plaintiff is formally stated in its request for rulings numbered 36 and 37 (which were refused) in the following words: "36. The bank is not liable in this case on the.

ground that it received the proceeds of the checks or on the ground that obligations owed by it were satisfied by the use of the Spinney money, for the reason that no benefit enured to the bank from all of Punchard's transactions taken as a whole, and consequently no benefit can be said to have enured to the defendant from any one of the transactions. Craft *v.* South Boston Railroad, 150 Mass. 207, 210. Newell *v.* Hadley, 206 Mass. 335, 344." "37. When no benefit enures to the defendant from all of a defaulter's transactions taken as a whole no benefit can be said to enure to the defendant because one of its debts was paid · in a series of thefts which the defaulter was enabled to continue by the payment in question." Assuming the rule to be as stated in the above requests, we must determine the question of its applicability to the facts here presented. It was decided in *Craft v. South Boston Railroad*, 150 Mass. 207, that where the defendant corporation's treasurer, being indebted to it on account of defalcation, issued notes purporting to bind it without authority to do so, used the proceeds to pay debts owed by it, and there were further defalcations by the treasurer, the defendant was not liable to the person whose money had been used to pay the debts, Field, J., saying at page 210: "Whether it was a benefit to the company that . . . [the treasurer] was able to obtain and use money for this purpose is necessarily uncertain." In *Newell v. Hadley*, 206 Mass. 335, 344, it was said that the rule above quoted was the decision in *Craft v. South Boston Railroad*, 150 Mass. 207, and that the sentence above quoted meant that the plaintiff had failed to prove that the transaction as a whole had resulted in a benefit to the defendant when the payment had enabled the defaulter to steal more than was paid.

It is to be noted that the case at bar is distinguishable from *Craft v. South Boston Railroad*, 150 Mass. 207; *Foote v. Cotting*, 195 Mass. 55, 60–61; *Newell v. Hadley*, 206 Mass. 335, 340–341; and *Bartholomew v. Stobbs*, 280 Mass. 559, 562, which are relied on by the defendant to support its requests numbered 25, 29 and 36, in that in many instances the proceeds of the Spinney securities came into

the defendant's hands as credits of the Federal Reserve Bank instead of being used to pay its debts. The essential question, however, would seem to be whether any immediate benefit to the defendant was cancelled thereby permitting Punchard ultimately to steal a larger sum. Punchard's ability to use the Spinney money and his misuse of it in repairing irregularities in the accounts of other customers and in the Punchard, Agent, account were two of the factors, together with others reported by the auditor, which enabled Punchard to prolong his wrongdoing, but the auditor was unable to find to what extent this prolongation resulted in losses to the bank heavier than would otherwise have occurred. The credits placed to the defendant's name at the Federal Reserve Bank or the purchases of stocks for its account were clearly direct and immediate benefits to the defendant. The burden of proof in these circumstances should be on the defendant to prove that ultimately there was no benefit to it because it allowed Punchard to steal further sums greater in amount than those paid to the defendant or used to purchase stocks for it. Such seems to be the rule governing the burden of proof in *quasi* contract actions. See *Mayer* v. *Mayor, Aldermen & Commonalty of New York,* 63 N. Y. 455; *Hathaway* v. *County of Delaware,* 185 N. Y. 368, 370; *Gibbons* v. *Perkins,* 132 Misc. (N. Y.) 583; *Walker* v. *Conant,* 65 Mich. 194; *New York, New Haven & Hartford Railroad* v. *Ansonia Electrical Co.* 83 Conn. 462. It is to be further noted from the auditor's report that Punchard's ability to use the Spinney money and estate money was one of two factors with other factors which enabled him to prolong his wrongdoing, but the auditor was unable to find the extent of such prolongation and the extent of resulting heavier losses. Aside from the burden of proof the evidence fails to show that the benefit to the defendant in the form of bank credits or otherwise was no benefit at all because it enabled Punchard to continue his stealings to any determinable amount.

Apart from the lack of proof that Punchard's repairing of his irregularities enabled him to steal further from the defendant in any appreciable amount, the auditor finds

that the bank was negligent after November 8, 1929, in such respects as in the handling of the "Punchard, Agent," account which "showed many transactions, both debit and credit, in sums extraordinary and inconsistent with the proper handling of an account created and carried for dealing in 'rights' as aforesaid," "in the failure to discover the employment of Hornblower and Weeks . . . after the warning on that point," and "in the failure to follow up many overdrafts shown in accounts other than 'Punchard, Agent,'" with the natural result that its negligence resulted in "a failure to discover earlier and stop further misappropriations of the Spinney money." It follows that, since the bank's negligence permitted further misappropriations, these misappropriations allowed Punchard to steal further from the bank, that the bank's negligence was also the cause of Punchard's being able to steal, that, to whatever extent the benefit from the credits was reduced by the resulting opportunity to steal more, the bank itself was responsible because of its negligence for the further stealing by Punchard. In these circumstances it cannot reasonably be said that the benefit from credits set up from the proceeds of the Spinney securities was wholly or in part no benefit at all because they gave an opportunity to inflict further losses on the defendant. Even if it is assumed that the ability of Punchard to commit further thefts by covering up previous defalcations with the plaintiff's stolen money did amount to a change in position, it seems to be settled that a change of position is no defence when the reception of the benefit is ascribable to negligence or other fault on the defendant's part. *Union Bank* v. *Bank of United States*, 3 Mass. 74. *Newburyport* v. *Fidelity Mutual Life Ins. Co.* 197 Mass. 596. *Metcalf* v. *Denson*, 63 Tenn. 565.

Groups 5 and 10. The items sought in these groups include the proceeds of Mrs. Spinney's securities sold by brokers in her lifetime or after her death, the proceeds at Punchard's direction being applied by the broker in payment for the purchase of securities ordered and paid for by customers of the bank. As to these items the defendant contends "that the maintenance by the defendant of 'a de-

partment for effecting the purchase or sale of securities for persons desiring such service' . . . was *ultra vires* and that consequently no legal obligation rested upon the bank to deliver to the other customers . . . the securities which they had ordered"; that "A national bank has no authority to act as a broker or agent for others in the purchase and sale of securities," citing *Farmers' & Merchants' National Bank* v. *Smith,* 77 Fed. Rep. 129, 137, *Weckler* v. *First National Bank of Hagerstown,* 42 Md. 581, *L'Herbette* v. *Pittsfield National Bank,* 162 Mass. 137. It is immaterial whether the maintenance of the securities department was *ultra vires* the bank or not. It would at least be liable to the customers for the amount of the purchase money paid the defendant on faith that it would perform its undertaking. *L'Herbette* v. *Pittsfield National Bank,* 162 Mass. 137. *Citizens' Central National Bank of New York* v. *Appleton,* 216 U. S. 196. *First National Bank of Aiken* v. *J. L. Mott Iron Works,* 258 U. S. 240. It may be inferred that the securities were delivered to the customers and since the plaintiff's money produced the securities, the plaintiff has benefited the defendant to the extent of the discharge of its obligation to its customers. No difference appears between the prices paid to the brokers at Punchard's direction and the prices paid to the bank for the purchase of the securities. If the shares were not delivered but remained in the hands of the bank clearly it would be liable for their value at that time, at least to the amount of the price paid. The defendant under its requests numbered 25, 29 and 36 contends that, apart from the question whether its acts were *ultra vires,* "The bank is not liable in this case on the ground that it received the proceeds of the checks or on the ground that obligations owed by it were satisfied by the use of the Spinney money, for the reason that no benefit enured to the bank from all of Punchard's transactions taken as a whole, and consequently no benefit can be said to have enured to the defendant from any one of the transactions," citing *Craft* v. *South Boston Railroad,* 150 Mass. 207, 210, *Newell* v. *Hadley,* 206 Mass. 335, 344, and that the bank was not liable in respect to

group 5 for the reason that "Punchard was acting as Mrs. Spinney's agent in giving directions to the brokers with regard to the application of the proceeds of the sale of Mrs. Spinney's securities"; and was not liable "With respect to the items in group 10" for the reason that "Punchard acted as executor in directing the brokers with regard to the application of funds which belonged to him as executor."

The defendant further contends that the payment of its debts in the circumstances without its knowledge imposes no obligation upon it, because these payments were similar in their legal effect to payments of debts by a stranger without the knowledge of the debtor. This is not strictly accurate because the defendant does not appear to have been under any debt liability to the brokers in respect to their securities until, ordered by Punchard, the plaintiff's money was used to obtain property for the defendant. The principle upon which the defendant relies is supported by *Kelley* v. *Lindsey*, 7 Gray, 287, and by *Newell* v. *Hadley*, 206 Mass. 335, and cases cited therein, but in *Newell* v. *Hadley* it was held that when a trustee of two trust estates stole the money of one trust to pay the debts of another, the trustee of the first trust could recover in equity the sums so expended from the second trust. The instant case is like *Newell* v. *Hadley* and *Bremer* v. *Williams*, 210 Mass. 256, in that the plaintiff's money was stolen. The fact that the plaintiff's money was stolen or embezzled provides sufficient distinction why the principle of *Kelley* v. *Lindsey*, 7 Gray, 287, should not be extended and why the decision here should harmonize with *Newell* v. *Hadley*. The important question is whether the plaintiff was an officious intermeddler. Clearly Mrs. Spinney was not and clearly the beneficiaries of her estate for whose benefit this action is brought were not intermeddlers. There is an obvious difference between the plaintiffs in the cases cited in *Foote* v. *Cotting*, 195 Mass. 55, 60–61, and beneficiaries whose fiduciaries embezzle money entrusted to them. The former advanced their money voluntarily and when advances were made to agents could have protected themselves by investigating the agents' authority as in *Kelley*

v. *Lindsey,* 7 Gray, 287.   In the case of beneficiaries whose
fiduciaries embezzle their money, the money is taken and
diverted to the benefit of the debtor defendant without their
will and authority and they have no means of protecting
themselves beyond omniscience as to the future probity of
the fiduciaries.   To say that in no case could the defendant
be made a debtor without its consent in respect to benefit
received from property which was the product of the plain-
tiff's money would be to overturn such cases as *Atlantic
Bank* v. *Merchants' Bank,* 10 Gray, 532, and *Atlantic Cotton
Mills* v. *Indian Orchard Mills,* 147 Mass. 268, for in each of
them the defendant in an action at law was made debtor
without its consent to the plaintiffs therein.   Here the de-
fendant has had the benefit of the value of property bought
for it with the plaintiff's money and in equity and good
conscience it should account for the value of the property.
*Foote* v. *Cotting,* 195 Mass. 55, 60–61, cited by the defend-
ant, is distinguishable in its facts.   See supporting *Atlantic
Cotton Mills* v. *Indian Orchard Mills,* 147 Mass. 268; *Fair-
field* v. *Southport National Bank,* 80 Conn. 92; *Lowndes* v.
*City National Bank of South Norwalk,* 82 Conn. 8; *Aldrich*
v. *Chemical National Bank,* 176 U. S. 618.

Group 3.   The auditor states that this group is com-
posed of cases in which Punchard, during Mrs. Spinney's
lifetime, sold her securities and caused the proceeds to be
exchanged for cashier's checks to pay for securities for
others.   What happened was that Hornblower and Weeks
remitted the proceeds of sales of the Spinney securities sold
at Punchard's order by checks on a Boston bank drawn to
the defendant's order and accompanied by a letter of trans-
mittal addressed to the bank.   These checks were indorsed
by the defendant's cashier and "deposited to its credit at
the Federal Reserve Bank" and were duly paid by the
drawers.   Contemporaneously with the receipt of these
broker checks Punchard sent cashier's checks of the de-
fendant or checks drawn by the defendant on a Boston
bank to the order of the brokers.   These checks were signed
by Punchard as assistant cashier of the defendant bank.
Apparently the checks sent by the brokers to the bank were

used to balance the withdrawals. In any event the defendant got the benefit of them and they are covered by the principles discussed in connection with groups 1, 2, 7 and 8. What herein is said as to groups 1, 2, 7 and 8 is applicable to the check sent by the broker which was entered on the general ledger of the bank as cancelling a fictitious obligation appearing on the ledger of the bank as due from Hornblower and Weeks.

Groups 4 and 9 involved checks remitted by the brokers to the bank for the sale of securities of Mrs. Spinney. No finding is made by the auditor as to the disposition of these checks other than that they were deposited to the defendant's credit at the Federal Reserve Bank. There is nothing in the evidence to support the contention of the defendant that "Punchard may have presented the checks to the teller and obtained cash for them, which he misapplied." The checks seemingly came to Punchard in the course of his duty as an officer of the bank, and it cannot be presumed he sold the checks to the drawee bank for cash.

Group 6 is composed of two items of transfers of certain sums by Punchard who had a power of attorney to draw checks from Mrs. Spinney's account at the bank, to the "Punchard, Agent," account and thereby "repair overdrafts irregularly caused by him in the 'Punchard, Agent,' account."

Group 12 consists of instances of transfers of items from Punchard's estate account, as executor, to the "Punchard, Agent," account. This was done by the entry of charges against the estate account and by the corresponding credit entered in favor of the "Punchard, Agent," account. In three cases this was done by charges against the estate account and in these instances by means of checks drawn by Punchard in a form equivalent to that of a check for "Cash" by deposit slips made out by Punchard and credited to the "Punchard, Agent," account. Some of these credits made good overdrafts in the account. With the exception of a $15 item all credits to the "Punchard, Agent," account were for the purpose of making good Pun-

chard's irregularities in the Punchard, Agent account.  As respects these transactions the defendant contends (1) that Punchard as executor stole the money from an account which belonged to him in a fiduciary capacity and that he was liable on his bond as executor for the amount;  (2) that he was not acting in behalf of the bank, or as its agent in dealing with the deposit account to which he had title;  (3) that the bank can be held liable in those cases only on the theory that the money went to cover up prior thefts from the bank by Punchard;  and (4) that these thefts were unknown to the bank and the covering up of them resulted in no ultimate benefit to the bank.  The plaintiff draws attention to the fact that in this group items B–1, B–5—B–7 and B–13 corrected overdrafts in the "Punchard, Agent," account.  It is to be noted that the facts, if true, relied on by the defendant, *supra*, do not help the defendant since the auditor finds that its negligence after November 8, 1929, resulted in a failure to stop further misappropriation of the Spinney money.  The principles applicable have been discussed in connection with groups 1, 2, 7 and 8.  See in this connection *Lowndes* v. *City National Bank of South Norwalk*, 82 Conn. 8; *Schneider* v. *Thompson*, 58 Fed. Rep. (2d) 94; *Allen* v. *Puritan Trust Co.* 211 Mass. 409.

Group 13 represents "charges or checks against the estate in exchange for bank checks to buy securities for others."  This charging of the estate account was for the purpose of balancing checks issued by Punchard as assistant cashier to Hornblower and Weeks in payment of securities for bank customers whose accounts had been charged with them and Punchard had wrongfully delayed purchasing.  It is plain that, whatever right Punchard as executor had to draw on the estate account, the issuance of the cashier's check was a bank function and that these funds were used to perform a duty incurred by the bank in the due course of its business.  The estate received no equivalent for the charges.  The bank used trust funds of the estate for its own purpose and to satisfy its own obligations. It received the trust money from the trustee through the hands of its agent and could accept and use it only with

the knowledge its agent had. *Lowndes* v. *City National Bank of South Norwalk,* 82 Conn. 8. *Schneider* v. *Thompson,* 58 Fed. Rep. (2d) 94. This is also true of the amount of his counter checks drawn on the estate account by Punchard, as executor, and applied to balance a cashier check signed by Punchard and a bank check signed by an officer of the bank, sent in each instance to the brokers in payment for securities ordered by Punchard for the account of the bank.

Group 11 represents the only instance (Schedule B, item 31) where the proceeds of Hornblower and Weeks' check, after Mrs. Spinney's death, was credited to her estate and later used by Punchard to balance a cashier's check of the defendant bank used to purchase securities for a customer who had ordered and paid for them. The auditor finds that, on the same day the bank's check was sent to the broker, the account of the estate was charged with exactly that sum, but that on the evidence it was impossible to state whether Punchard drew the sum "aforesaid from the estate account by check as executor or caused it to be transferred, without check, by virtue of his position as assistant cashier. In either case, a reasonably careful scrutiny of the 'Punchard, Agent,' account, constantly before officers of the bank other than Punchard because of overdrafts, should have put the bank sufficiently upon its inquiry to discover the misappropriations in this item."

As respects the last item of $1,000 in group 7, Punchard was assistant treasurer of the North Shore Babies Hospital with authority to draw checks "in its name against its account at the bank." On September 22, 1930, to repair his irregularities in the account of one Anderson, he caused part of the proceeds of a check from the brokers to be credited to her account from the hospital account. Two days later he repaired in part the shortage so caused in the hospital account by transfer to the hospital account from the Punchard account. The auditor finds that "The above sum of $1,000 of estate money went to the Hospital account to make good an improper transaction by Punchard not as an officer of the bank but as an officer of the Hospital"; and "that the bank was not liable to the Hospital

on account of Punchard's transfer of $2,625 from the Hospital account to the Anderson account." But, the auditor finds, that the bank was liable because the "diverting of the estate money, remitted in a check drawn to order of the bank, from the estate to another for any purpose was, and could only be, done by Punchard as an officer of the bank and by virtue of his position as such officer," and that the bank is "liable for the whole amount of $1,450.27."

In none of these items found in group 11 and group 7 did the bank benefit by the transaction of Punchard and the case ordinarily would fall within the class of decisions holding that where an officer of a bank or corporation merely uses it as a conduit for the transfer of funds equitably belonging to others the bank or corporation is not liable. *Bank of Overton* v. *Thompson*, 118 Fed. Rep. 798. *Security National Bank* v. *Bigelow*, 205 Iowa, 695. *Brookhouse* v. *Union Publishing Co.* 73 N. H. 368. However, each of these diversions was accomplished at a time subsequent to the date (November 8, 1929) after which the bank was found by the auditor to be guilty of a negligence which resulted in a failure to stop further misappropriations of the Spinney money. This situation is fully covered by the case of *Lowndes* v. *City National Bank of South Norwalk*, 82 Conn. 8, wherein it was held that although the bank had received no benefit, its officer's frauds had been effected by using the machinery of the bank under the officer's control and the bank was liable in failing to discover the fraud of its officer and was chargeable with constructive knowledge of his dishonest acts. See also *Aldrich* v. *Chemical National Bank*, 176 U. S. 618, and *Tremont Trust Co.* v. *Noyes*, 246 Mass. 197, 207.

The defendant contends that under the rule stated in *Manhattan Co.* v. *Lydig*, 4 Johns. 377, and similar cases, the bank was not chargeable with knowledge of anything Punchard did as executor; that in connection with item 31 Punchard did absolutely nothing wrongful except in drawing the check; that although "the check was drawn for an improper purpose, Punchard's knowledge of this purpose was not attributable to the bank." A limitation of the prin-

ciple here involved which would prevent too great a burden on a bank or corporation is stated in *Cutting* v. *Marlor,* 78 N. Y. 454, 460, in these words: "The bank might not be liable for a single act of fraud or crime on the part of an officer or agent, while it would be for a continuous course of fraudulent practice, especially those so openly committed and easily detected as these are shown to have been." This quotation is applicable to the situation presented in the present case. The item of $1,000 in group 7 can well be put without further discussion into the same class and liability imputed to the defendant for similar reasons.

As respects the question of interest, the defendant cannot maintain its position that outside groups 5 and 10 interest, if receivable, can be received only in accordance with the defendant's request 42, which reads: "Until the claim is merged in a judgment interest runs only at the rate paid by the bank on deposits," citing *Pierce* v. *Boston Five Cents Savings Bank,* 129 Mass. 425, *Schmidt* v. *People's National Bank,* 153 Mass. 550. The rule relied on is applicable only where an action is for a deposit, or on a written instrument, and there is an agreement in respect to the rate of interest to be paid. Here the action is not brought on a contract containing an agreement as to the rate of interest. The ruling that the plaintiff was entitled to six per cent interest on each remittance from the date it reached the bank is correct on the authority of *Newburyport* v. *Fidelity Mutual Life Ins. Co.* 197 Mass. 596, 604. *Atlantic National Bank* v. *Harris,* 118 Mass. 147. *Allen* v. *Puritan Trust Co.* 211 Mass. 409.

We find no error in the refusal to grant the requests of the defendant which were refused, or in the ruling of the trial judge to the effect that the auditor's "findings of fact as inferences from other facts . . . are correct." It follows that the trial judge properly allowed the motion of the plaintiff (printed in the report); and that his order of judgment for the plaintiff on the auditor's report with interest computed in accordance with the second or alternative method set forth in the auditor's report is

*Affirmed.*